No. 62,913

STATE OF KANSAS, *Appellee*, v. TOMMY JOE CRABTREE, *Appellant*.

(805 P.2d 1)

Opinion filed January 18, 1991.

*Thomas Jacquinot*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Timothy J. Chambers*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Tommy Joe Crabtree from his conviction by a jury of second-degree murder (K.S.A. 21-3402). He was convicted for the shotgun slaying of his stepfather, Marion Clay.

Crabtree raises two issues on appeal. He contends a combination of prosecutorial and judicial misconduct deprived him of a fair trial as guaranteed by the due process clause of the federal and state constitutions. He also argues that the trial court erred in failing to instruct the jury that the affirmative defense of self-defense did not shift the State's burden of proof to the defendant and that the failure to do so was clearly erroneous.

Tommy's mother, Esta Clay, married Marion Clay soon after she met Marion in 1981. Marion moved in with Esta and her three children. At the time, Tommy was 11, his sister was 10, and his brother, Paul, was 4. Within weeks, Marion was beating Esta and the children. Within a year, Marion was having sexual intercourse with Tommy's sister on a regular basis.

It is not necessary to recount all the instances of violence in the record. Suffice it to say, Marion was schizophrenic, abused drugs and alcohol, and failed to take his prescribed medicine for his schizophrenic condition. He was often violent to family members and his acts were brutal in nature. The shooting took place some seven years after the last physical violence to Tommy by Marion. During most of the intervening years, Tommy was not in the home (having been removed from the home by SRS) and Marion was in and out of mental institutions and other institutions. However, during those years, there were severe problems in the family caused by Marion. He continued to physically abuse Esta and sexually abuse Tommy's sister. Marion, at times, thought he was the "outlaw Josey Wales."

In 1985, Marion beat Esta, and Tommy attempted to shoot Marion, but missed. Marion was arrested, but, apparently, not prosecuted. Also in 1985, Tommy's sister reported to the police that she was being sexually abused. Although she passed a polygraph test and her story was corroborated by her mother, Marion was not prosecuted. Esta then divorced Marion.

In 1987, Marion was released from Larned State Hospital. He had been convicted of some crime, but it is not clear from the record what he had been convicted of. As part of Marion's parole agreement, he agreed to stay out of Dodge City, to take his psychotropic medicine, to attend mental health counseling, and not to consume any alcohol.

Upon his release, Marion immediately violated each of the conditions of his parole. At Marion's request, Esta moved to Hutchinson with Paul. Tommy decided to go along. He testified that although things initially went well in Hutchinson, Marion quit taking his medicine and started drinking heavily. All witnesses testified that when Marion drank, he became argumentative and threatening.

On the day prior to the shooting, Marion made sexual advances toward Tommy's girlfriend, Marcie. She told Tommy about this. Tommy came home from work and Marion, Esta, Paul, Marcie, and Steven Bonham (a friend of Tommy's) were there. Marion had been drinking and repeatedly (as long as $1^1/_2$ hours) played a pornographic tape he had made in prison expressing his desires for Esta. Tommy removed the tape and broke it.

Eventually, Marcie's mother came and picked her up. Marcie left her car parked in front of the house. At this point, there is some disagreement in the testimony as to what happened next. Apparently, Marion was upset that Marcie's car was parked on the street in front of the house. Tommy testified that Esta came to his room and told him that Marion wanted Marcie's phone number. Tommy testified that he refused to give the number, and Marion came in and demanded it. Tommy testified that he went out and moved Marcie's car across the street, but that Marion kept complaining about the car. Tommy testified that Marion said something about fighting him and threatened to get a knife, but that he (Tommy) went to his room. Tommy testified that he got a shotgun from his room and followed Marion out of the house. Tommy admitted that he did not know whether Marion had a knife, and he admitted that he never had observed a knife and that no one told him Marion had a knife.

Tommy testified that, once outside, Marion went to his car, which was parked the wrong way on the street in front of the house, and sat down in the car. Tommy testified that he went to the front of the car, but did not point the shotgun at Marion. Tommy testified

that Esta came and started telling him to give the gun to her, but that he did not remember if she grabbed it. According to Tommy, during this argument, Marion got out of the car, and somehow the gun went off, killing Marion. Tommy specifically denied that Paul was outside at this time. After Tommy was arrested, he told the police that he had pointed the shotgun down the sidewalk and pulled the trigger in order to scare Marion, but that Marion had jumped in front of the gun.

Esta's version of the incident was slightly different. In particular, she testified that when Marion and Tommy were arguing in the house, Marion repeatedly told Paul to get him a knife. Esta testified that when she went to Tommy's room to tell him that Marion wanted to talk to him, she told him that Marion had a knife. Esta testified that, outside the house, she actually attempted to grab the gun from Tommy, but she did not remember if she touched Tommy. Esta testified that this did not occur near the front of the car, but near the driver's door.

Tommy, Esta, and Paul all testified that Paul was inside the house when the shooting occurred.

There was an eyewitness who viewed these events from his house 250 feet away. James Rue testified that, as he was returning home, he heard arguing from Esta's residence. He testified he heard someone yelling about a phone number. He testified that Marion and a heavyset woman (Esta) came out of the house and got in a car, then got out and headed back to the house, and then turned around and went back to the car. He testified they then returned to the house, and Marion came out alone and stood by the driver's door of Esta's car. He testified that Tommy came out of the house and walked toward Marion and he could hear Marion ask him for the phone number. He testified that Tommy moved the other car (Marcie's) across the street. He testified that then they both returned to the house.

Rue testified that he then saw Marion come out of the house again and sit in the front seat of Esta's car. He testified that Tommy came running out of the house and that his little brother (Paul) and mother followed. Rue initially misdescribed the mother and brother to police, although he later identified them as the people he had seen. He testified that Tommy stood behind the driver's door, and that Paul came running up and grabbed him. He testified that Tommy

got around Paul and ran up to the front of the car, and that Marion stood up from the car and Tommy raised a shotgun and aimed it at Marion. Paul apparently struggled with Tommy, and the gun went off. Rue testified he could hear a lot of what was going on and that he never heard Marion threaten Tommy.

It is undisputed that after the shooting, Esta, Tommy, and Paul all got in the car and started driving. Tommy tossed the shotgun out of the car. They were stopped by police and all initially told the police that someone else shot Marion.

The jury, which was instructed on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter, found Tommy guilty of second-degree murder.

The defense's first contention is that counsel for the State made factual misrepresentations during trial such that defendant's motion for a new trial should have been granted. One of the defense's tactics at trial was to show that tension was building between Marion and Tommy all along due to Marion's conduct in the home. Tommy was generally aware that Marion had been having sex with Tommy's sister. This evidence was apparently offered to show why there were problems between Tommy and Marion. Tommy was also aware that Marion had made advances toward Marcie.

Crabtree sets forth in great detail the questions and answers he relies upon to show prosecutorial misconduct. For example, the assistant county attorney, who tried the case, in summation argued:

"They present to you evidence such as [Tommy's sister] who testified she was raped repeatedly by Marion Clay and yet the facts are that the one time that she was confronted by law enforcement about that she said it never happened. The doctor could find no evidence. No charges were ever filed against Marion Clay. He was convicted of nothing, but the defense wants you to ignore the rules when it helps their case and they want you to believe that Marion Clay was a rapist."

The evidence at trial does not show the sister ever lied to police or that there was no sexual abuse. The State had information available to corroborate the sexual abuse.

The problem with the defendant's argument is that counsel must make a contemporaneous objection. "This court has repeatedly held that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where no objection was lodged." *State v. Walker*, 244 Kan. 275, 280,

768 P.2d 290 (1989). Having failed to make a contemporaneous objection, the issue will not be considered on appeal.

When the closing argument issue is not considered, then the questions and answers during trial are of little importance because they were questions rather than assertions, and Tommy answered those questions by saying that he had no knowledge of what the State was attempting to establish.

Crabtree also argues that counsel for the State was rude throughout the trial and that he also used objections to make speeches. Having examined the record, counsel for both the State and the defense at times exhibited inappropriate behavior.

It is discretionary with the trial court whether to grant a new trial under K.S.A. 22-3501 because of misconduct of counsel. *State v. Holley*, 238 Kan. 501, 712 P.2d 1214 (1986). Reversal is warranted only when the appellant has shown conduct prejudicial to his or her substantial rights. *State v. Chism*, 243 Kan. 484, 493, 759 P.2d 105 (1988).

Crabtree also complains of judicial misconduct. He argues that the trial court failed to maintain order in the court and failed to reprimand the State when it was disruptive or making speeches during objections. While the court might have attempted to rein in both counsel more than it did, that might have disrupted the trial even more. The record reflects that the trial court attempted to be fair. It properly reprimanded both counsel on occasion. The record does not show abuse of discretion or judicial misconduct on the part of the trial court.

Crabtree also argues that the State's closing arguments were improper and "calculated to inflame the passions or prejudices of the jury." It should be noted that the defense did not object to the closing and that issue is raised for the first time on appeal. As noted above, the defense must make a contemporaneous objection and cannot challenge the closing argument on appeal for the first time.

In any event, both parties are entitled to considerable latitude in closing argument. In addition, "There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments by defense counsel." *State v. Bird*, 238 Kan. 160, Syl. ¶ 14, 708 P.2d 946 (1985).

Here, the defense at least implicitly attempted to show Marion Clay was a person who justifiably should have been shot because of his treatment of his wife and stepchildren. The State justifiably met that premise in its closing argument.

We have examined each of the defendant's complaints, both individually and as a whole, and are unable to say that the conduct prejudiced the defendant's substantial rights; thus, the trial court did not abuse its discretion in denying the motion for a new trial.

The defendant next argues that the trial court erred in failing to give a PIK Crim. 2d 52.08 instruction. The trial court gave the following instruction of self-defense from PIK Crim. 2d 54.17, as instruction No. 9:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

In the Notes on Use to PIK Crim. 2d 54.17, it is stated that PIK Crim. 2d 52.08 should also be given. PIK Crim. 2d 52.08 makes clear that the defendant does not bear the burden of proving the affirmative defense. It provides:

"The defendant claims as a defense that (*here describe the defense claimed*). Evidence in support of this claim should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant. If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you should find the defendant not guilty." PIK Crim. 2d 52.08.

The defense did not request this instruction. No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414(3).

In determining whether there was error in failing to give an instruction, "[j]ury instructions are to be considered together and read as a whole, without isolating any one instruction." *State v.*

*Morris*, 244 Kan. 22, 23, 765 P.2d 1120 (1988). The trial court did give PIK Crim. 2d 52.02 as jury instruction No. 2. It provides:

"The State has the burden of proving the defendant is guilty. The defendant is not required to prove he is not guilty. You must assume the defendant is not guilty unless the evidence convinces you of the defendant's guilt.

"Your determination should be made in accordance with these instructions, and this is the test you should apply: If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty. If you have reasonable doubt as to any of the claims made by the State, you should find the defendant not guilty."

Although PIK Crim. 2d 52.02 does not specifically address the burden of proof when an affirmative defense is asserted, it does state the general rule that the State has the burden; the defendant never has to prove himself not guilty.

In an analogous case, this court stated:

"Even had the defendant objected to the court's failure to give the instruction, it does not seem likely that the jury would have returned a different verdict if such an instruction had been given. Instructions were given to the jury regarding defense of a person, reasonable doubt, the burden of proof, the definitions of the various legal terms relating to criminal intent, and that the prosecution's burden to prove such intent never shifts to the defense. The fact that the court failed to use PIK Crim. 2d 52.08 will not be considered error when there were other instructions which made it clear that the burden of proof was on the State. Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused. *State v. Peoples*, 227 Kan. 127, 136, 605 P.2d 135 (1980); *State v. Wilson*, 221 Kan. 92, Syl. ¶ 3, 558 P.2d 141 (1976); *State v. Taylor*, 212 Kan. 780, Syl. ¶ 2, 512 P.2d 449 (1973)." *State v. Osbey*, 238 Kan. 280, 285-86, 710 P.2d 676 (1985).

Here, there is a bare scintilla of evidence, if any, that would justify a self-defense instruction. Counsel for the defendant at oral argument suggested it would be necessary for us to adopt a "battered child" syndrome defense that would use the same language and justification used in adopting the battered wife syndrome defense. On the record and briefs before us, we decline to adopt a battered child syndrome defense.

Obviously, the trial court should have given PIK Crim. 2d 52.08. PIK Crim. 2d 52.08 should be given whenever an affirmative defense is asserted in a criminal case. Here, however, when the instructions are considered as a whole and in light of the

facts of the case, we cannot say the failure to give PIK Crim. 2d 52.08 was clearly erroneous.

Affirmed.