No. 78,966

STATE OF KANSAS, *Appellee*, v. JEFFREY J. SPERRY, *Appellant*.
(978 P.2d 933)

Opinion filed May 4, 1999.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Ezra Ginzburg*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Jeffrey J. Sperry*, appellant, was on the brief pro se.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Jeffrey Sperry appeals his conviction by a jury of one count of premeditated first-degree murder. He was sentenced to life imprisonment (hard 25), K.S.A. 22-3717(b)(1).

In the mid-afternoon on November 25, 1995, Kansas City, Kansas, police were dispatched to 25th and New Jersey, where they found a man in the driver's seat of a red car backed into a telephone pole. He had blood coming from his mouth and no pulse. A folding cellular telephone was open in his lap. There was no one else around. The key was in the ignition, the engine was running, and the back-up lights were on. There was a bullet hole in the windshield on the driver's side at the steering wheel level. A shell casing was found in a private drive across the street from the car. From the location of the shell casing and the way the vehicle's wheels were turned, police determined that the car had backed from the

private drive across the street into the pole. Tire marks in the drive indicated that the car left the drive at a high rate of speed.

The victim carried no identification. Police learned that he was Lonnie Mallicoat from his former wife, who called on the cellular telephone during the crime scene investigation.

An autopsy revealed that Mallicoat died as a result of a gunshot wound in his chest. Police recovered from a car that defendant had been driving a partially full box of shotgun shells. One of the shells had the name "Lonnie" scratched on it. Defendant's friend, Clinton "Bud" Rice, told police that "whenever Mr. Sperry was very angry at somebody, he would write their name on a bullet that he said he was going to shoot." Rice also told police that defendant and Mallicoat were friends, that defendant had supplied Mallicoat with money to manufacture some methamphetamine, and that defendant was angry because Mallicoat had not produced the drugs.

Defendant testified that he and Mallicoat were friends. He said he was "having dealings" with Mallicoat in November 1995 and that he was involved in drugs with Mallicoat "[t]o a very limited extent." He had loaned Mallicoat $600 for a car.

With regard to the shotgun shell with Mallicoat's name on it, defendant said that it was part of a private joke between the two of them.

Defendant testified that on the morning of Mallicoat's death, they made arrangements by telephone to meet at a restaurant. Mallicoat had only $400 of the $600 he owed. Defendant was supposed to find Reagan Brown and get Mallicoat's gun from her. Mallicoat said that by the time defendant got the gun, he would have the other $200. Defendant said that he would call Mallicoat to arrange getting together later.

Defendant met with other people during the day and by the time he met Mallicoat again, there were several other people accompanying defendant. The meeting place was a parking lot. Defendant had the pistol he had gotten from Brown. He took the pistol without the clip when he got out of the car to look for Mallicoat. Defendant found Mallicoat, told him he had the gun, and asked about the money. Mallicoat did not have it. They exchanged

some jealous words about Brown. Several people who had accompanied defendant left.

Defendant concluded that he would give Mallicoat the gun and hold the clip as collateral for the $200. For this purpose, he walked over to where Mallicoat was sitting in his car. Defendant testified that just as he got to the car it lurched backwards, cut to the right, "and the front end of the car come back." The pistol in defendant's hand caught against the door frame, the fender hit his legs, and he staggered backward. Then Mallicoat stopped his car and put it in drive. Defendant pointed the gun at the car "and the gun just went off." Then, according to defendant, Mallicoat shifted the car back into reverse and backed out of the lot.

Defendant testified that he thought the gun was empty and that he did not aim at Mallicoat. He did not know how the gun got cocked. He described pointing the gun at the car as "an instinctive reaction" to the expectation that he was going to be run over.

Defendant's appellate counsel raises five issues on appeal. Defendant filed a pro se brief, raising several additional issues and expanding on the issues raised by appellate counsel. We first address the issues raised by appellate counsel. The first issue is whether the trial court erred in excluding evidence that might tend to show that defendant believed the victim to be a murderer.

Appellate counsel portrays this issue as a matter of exclusion of evidence necessary to defendant's theory of self-defense, which would constitute denial of his due process right to a fair trial under *Chambers v. Mississippi,* 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Examination of the record and pertinent authorities, however, shows that there is nothing more than an ordinary evidentiary ruling at issue.

Defendant complains that the trial court excluded a portion of the statements he made in an interview with Detective Shomin and District Attorney Nick Tomasic on May 15, 1996. Defendant took the stand on his own behalf. In the course of his testimony, defendant told of sending a letter to Shomin requesting an interview, which he hoped to parlay into a lowered bond amount. He testified that when the interview began, he declined to have his attorney present because he was going to give them information

about cases other than the one against him. The prosecutor objected:

"What I anticipate him saying, what he told Shomin was that Lonnie Mallicoat and Bud Rice had done some homicides in Missouri. It has no relevance in this case. All he is trying to do is drag their names through the mud, and there's been no charges against them."

Defense counsel responded:

"I anticipate [the prosecuting attorney] will be bringing Mr. Tomasic and Detective Shomin in for rebuttal to rebut his testimony and to discuss things that occurred in that meeting. If that meeting is going to come into play, I think the entire contact of that meeting is relevant. I'm just trying to bring out my case in chief for tactical purposes, to make sure we are not trying to hide anything."

The district court ruled that testimony about Missouri homicides was not relevant.

On rebuttal, the State recalled Detective Shomin, whose testimony during the prosecution's case in chief had not touched on the interview with defendant. Shomin testified that he and Tomasic had met with defendant at the latter's request, that defendant had told them he was in a motel in Raytown when Mallicoat died, and that Reagan Brown had killed Mallicoat. The State also called Tomasic on rebuttal. With regard to the interview, he testified that defendant had told them he was in a motel in Raytown or Grandview at the time Mallicoat died and that either Reagan Brown or Bud Rice had killed Mallicoat. Defense counsel did not attempt to question Shomin or Tomasic about defendant's statements that Mallicoat and Rice had committed homicides in Missouri, and no surrebuttal evidence was offered.

On appeal, the argument is made that defendant's belief that Lonnie Mallicoat "had done some homicides in Missouri" should have been admitted because it would have lent credence to defendant's defense of self-defense. The specific contention is that the evidence would have supported the subjective element of the defense: defendant's belief that Mallicoat was going to run over him with the automobile. During trial, however, this use of the evidence was never mentioned. This court has long held that constitutional grounds asserted for the first time on appeal are not

properly before the appellate court for review. *State v. Shears*, 260 Kan. 823, Syl. ¶ 8, 925 P.2d 1136 (1996).

The evidence was excluded for lack of relevance. Admission or exclusion of evidence is entrusted to the sound discretion of the trial court. "Discretion is abused only where no reasonable person would take the view adopted by the trial court. Absent a clear showing of abuse of discretion, evidentiary findings of the trial court will not be set aside on appeal." *State v. Donesay*, 265 Kan. 60, Syl. ¶ 5, 959 P.2d 862 (1998). There is no showing of abuse of discretion in this instance.

Appellate counsel also attempts to cast this issue as a denial of defendant's "due process right to show the totality of the circumstances surrounding his statements to police." He relies on *Crane v. Kentucky*, 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986), for the principle that a criminal defendant must be allowed to introduce evidence of the circumstances surrounding the taking of his confession.

*Crane* is not applicable to the present case. Defendant did not confess. Nor did he seek to show the circumstances attending his interview with Shomin and Tomasic. Crane's defense depended almost entirely on his showing that his confession was unreliable, and that reason for not excluding the evidence was presented to the trial court. Defendant's self-defense theory depended primarily on his showing that Mallicoat was the aggressor and that defendant was reasonably justified in the use of deadly force. At best, the excluded evidence might have tended to show that defendant believed Mallicoat was capable of killing someone. It would have had no bearing on whether he believed or a reasonable person would have believed that Mallicoat intended to use unlawful force against defendant in the particular instance of this case. Moreover, it was never argued to the trial court that the excluded evidence was germane to defendant's theory of self-defense. We find no merit in defendant's argument.

The second issue is whether the trial court erred in admitting defendant's statements as rebuttal evidence. Defendant's statements to Shomin and Tomasic were made during an interview arranged at the written request of defendant. The interview took

place on May 15, 1996. Defendant had been bound over on the charge of first-degree murder of Mallicoat on February 29, 1996. He was incarcerated and was interested in securing his release by providing information to police. Defendant was acting as his own counsel, but the court had appointed counsel to assist him. Before the interview began, defendant was asked by Shomin and Tomasic if he was sure he did not want his appointed counsel present. Defendant declined, stating, "I'm not going to talk about my case."

Appellate counsel contends that an involuntary statement may not be used by the prosecution even in rebuttal when a defendant has taken the stand and testified about making the statement. In spite of its never having been argued in the trial court that the statement was involuntary, appellate counsel urges this court to consider the matter in order to prevent the denial of fundamental rights. See *State v. Puckett*, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1992). We fail to see the fundamental rights which were denied to defendant.

It is argued that Tomasic violated KRPC 4.2 (1998 Kan. Ct. R. Annot. 368), which provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The rule does not prohibit communication about matters that are not the subject of the representation. *Stone v. City of Kiowa*, 263 Kan. 502, 517-20, 950 P.2d 1305 (1997). In the present case, defendant told Tomasic at the outset that he was not going to talk about his own case and, for that reason, did not think his appointed attorney needed to be present. In the course of the discussion, however, defendant told Tomasic and the detective that he was elsewhere when Mallicoat was shot and that Reagan Brown did the shooting. It is not apparent from the record how the subject of Mallicoat's death entered the interview.

Appellate counsel contends that the sanction for the violation of professional ethics should be reversal of defendant's conviction. Appellate counsel cites *United States v. Thomas*, 474 F.2d 110

(10th Cir. 1973). *Thomas* does not support defendant's contention that his conviction should be reversed.

In spite of Tenth Circuit Court of Appeals' holding that the canon was violated, it declined to reverse Thomas' convictions. The court reasoned that the violation of the ethical canon before it did not need to be remedied by reversal because it involved an ethical and administrative question rather than a constitutional question.

The State directs this court's attention to *State v. Johnson*, 255 Kan. 140, 150, 871 P.2d 1246 (1994), where defendant complained that his statement was obtained in violation of the disciplinary rule that preceded KRPC 4.2. Like defendant, Johnson had initiated an interview with the officer testifying about his statements. 255 Kan. at 150. In Johnson's case, however, the prosecutor was not present. This court declined to conclude that an ethical violation required exclusion of the statement from evidence:

"In any event, this court has held with regard to DR 7-104(A)(1) [1993 Kan. Ct. R. Annot. 234] that the admissibility of evidence is determined by constitutional and statutory measures and that codes of professional conduct play no part. *State v. Morgan*, 231 Kan. 472, 478-79, 646 P.2d 1064 (1982). 'Sanctions for violation of DR 7-104(A)(1) are irrelevant to this case.' 231 Kan. at 479." 255 Kan. at 150.

The simple fact is that not only was there no argument raised in the trial court about the impropriety of the interview, but also defendant's statements to Shomin and Tomasic were introduced into evidence by defendant. No record was made of how the interview shifted to the criminal case against defendant so that this court has no basis for forming an opinion about the prosecutor's conduct during the interview. Defendant's argument is without merit.

The next issue is whether the jury should have been instructed on the State's burden of proof with regard to the defense of self-defense. The trial court gave PIK Crim. 3d 54.17 (1997 Supp.) with regard to the use of force in self-defense. The Notes on Use to that pattern instruction state: "If this instruction is given, PIK 3d 52.08, Affirmative Defenses - Burden of Proof, should be given." The trial court did not give PIK Crim. 3d 52.08 (1996

Supp.) or a like instruction. Nor did defense counsel request that it be given.

It is well established that this court reviews a trial court's failure to give an instruction by a clearly erroneous standard where the party neither requested the instruction nor objected to its omission. K.S.A. 1998 Supp. 22-3414(3). "Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

PIK Crim. 3d 52.08 states: "The defendant raises [self-defense] as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Defendant's appellate counsel acknowledges that the court considered this issue in *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 (1991), and concluded that failure to give the instruction was not clearly erroneous. He would have the court distinguish the present case as having more evidence justifying a self-defense instruction. We decline to do so. The heart of the court's reasoning in *Crabtree* was that, considered together and as a whole, the instructions that were given adequately guided the jury's consideration of the self-defense theory. There, as here, the jury was instructed on the presumption of innocence and the State's burden of proving defendant guilty beyond reasonable doubt. Thus, the court concluded that the jury was instructed on the substance of PIK Crim. 3d 52.08. 248 Kan. at 40.

The State calls to the court's attention that the trial court also gave PIK Crim. 3d 54.01, which states:

"Ordinarily, a person intends all of the usual consequences of [his] voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. *This burden never shifts to the defendant.*" (Emphasis added.)

The State also directs the court's attention to another case in which a self-defense theory was asserted but the pattern instruction for

the burden of proof for an affirmative defense was not given, *State v. Osbey*, 238 Kan. 280, 285-86, 710 P.2d 676 (1985). The result in *Osbey* was the same as in *Crabtree*, and there was no mention by the court of any lack of evidence to support the affirmative defense. In *Osbey*, the court stated: "Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused." 238 Kan. at 286. *Crabtree* and *Osbey* are controlling in the present case.

We next consider if defendant was denied a fair trial by the prosecuting attorney's questioning a police officer about defendant's conversing with him. Appellate counsel complains that, in response to the prosecutor's question, a police officer improperly commented in his trial testimony on defendant's exercising his right to remain silent. In *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the Supreme Court held that the State could not use a defendant's post-arrest exercise of his right to remain silent to impeach his exculpatory story, which was given for the first time at trial.

In this case, the officer was Robert Harper, who is employed by the Cass County, Missouri, Sheriff's Department. Defendant was in the Cass County jail on December 19, 1995, when he initiated a conversation with Harper. Harper knew that defendant was charged with homicide in Wyandotte County, Kansas. Defendant asked Harper to keep the jailers from "hassling" his girlfriend when she visited. Defendant also asked Harper to give him a law enforcement officer's view of a hypothetical situation, which he set out. The hypothetical circumstances included the driver of a car trying to run down one person, a third person pointing a gun at the driver to scare him, and the gun accidentally discharging. Harper testified: "I told [defendant] that at his request earlier, we were not going to discuss the Kansas City, Kansas incident; and that terminated the conversation; and I sent him back to the jail." There was no objection, but appellate counsel urges the court to consider this issue to prevent the denial of fundamental rights. See *Puckett*, 230 Kan. 596.

On cross-examination, defense counsel brought out that defendant liked to talk, that he had been to Harper's office on more than

one occasion, and that defendant talked about a lot of things. Harper also testified that when defendant initiated the conversation with the complaint about jailers hassling his girlfriend, Harper was not expecting the discussion to include criminal offenses.

Appellate counsel couched this issue in terms of the State's commenting on defendant's exercising his right to remain silent and relied on cases involving that issue. The real complaint, however, seems to be about the evidence that defendant had earlier given a version of the shooting that was inconsistent with his trial testimony. The real complaint appears in this statement in defendant's brief: "Because the statements to Officer Harper undercut Mr. Sperry's theory of self-defense, the error is not harmless. Absent his own statements to Officer Harper, the jury might have determined that Mr. Sperry did not plot or plan his theory of self-defense when he first was arrested." In other words, the harm to defendant's defense resulted from the jury's hearing that defendant posed a "hypothetical" situation to Harper that materially differed from his self-defense trial testimony, but obviously was simply a variation of the same story. Thus, it appeared that defendant was "trying out" a fabricated defense when he spoke to Harper. His having told inconsistent stories to Harper and to the jury undermined his credibility. It was *not* that defendant exercised his right to remain silent while in custody and then testified in his own behalf that undercut his self-defense defense.

Any error there might have been in the State's witness testifying that defendant had exercised his right to remain silent was unquestionably harmless in the circumstances. Defendant's appellate counsel cites *State v. Haddock*, 257 Kan. 964, 973, 897 P.2d 152 (1995), and *State v. Higgins*, 243 Kan. 48, 755 P.2d 12 (1988). *Haddock* is quite different from the present case. There, the court found no error in the State's revealing the accused's prearrest and pre-*Miranda* silence. In *Higgins*, the court rejected the State's contention that the error was harmless. Over objection, the prosecutor questioned a police officer in detail about defendant's refusing to talk to him after arrest, and in closing argument the prosecutor "entertained the jury with an extensive exploration of the motivations for defendant's silence. The State repeatedly asked, if de-

fendant was innocent why did he not protest his innocence at the time of his arrest?" 243 Kan. at 52. There is no comparison between *Higgins* and the present case. Here, according to appellate counsel's own statement, what harm there might have been to defendant's defense was in the jury's hearing that he had "tried out" one version on Officer Harper and given another at trial. There is no contention that any harm was due to Harper's unsolicited and isolated comment on defendant's exercising his right to silence. The argument has no merit.

The final issue raised by appellate counsel is whether defendant was denied effective assistance of counsel. In the trial court, defendant twice asserted his claim of ineffective assistance of counsel. He first did so at the time of trial, and the claim was rejected by the trial judge. He also filed a pro se motion for new trial in which he raised the claim again. At the conclusion of a hearing on the motion for new trial, the district court denied the motion. The journal entry filed on December 26, 1996, reflects denial of defendant's motion. On appeal, appellate counsel has raised the question whether defendant was denied effective assistance of counsel. In these circumstances, the court undertakes a de novo review of "the trial court's analysis of the performance and prejudice components, which are mixed questions of law and fact." *State v. Rice*, 261 Kan. 567, Syl. ¶ 16, 932 P.2d 981 (1997).

In *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985), the court adopted the standards set out in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), for determining ineffective assistance of counsel. The applicable principles have recently been restated in *Rice*, 261 Kan. 567:

"The Sixth Amendment right to counsel is the right to the effective assistance of counsel. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Syl. ¶ 12.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." Syl. ¶ 13.

"The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the effectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Syl. ¶ 14.

"In examining a defendant's claim of ineffective assistance of counsel, with regard to the required showing of prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Syl. ¶ 15.

In the present case, the argument is made that trial counsel's performance was deficient in his failing to make any effort to keep defendant's statement to Shomin and Tomasic from being admitted into evidence. Appellate counsel asserts that "[h]ad a motion to suppress been filed, it would have been successful on the grounds that Mr. Sperry's statements to Detective Shomin and District Attorney Nick Tomasic were not voluntary." As already discussed, however, the prosecutor's ethical violation is not a constitutional violation. It does not cause an otherwise voluntary statement to be deemed involuntary and does not require exclusion as a remedy. The grounds for the motion and objection advocated by appellate counsel are not meritorious. Thus, there is no basis upon which this court might find that trial counsel's performance was deficient with respect to defendant's statement to Shomin and Tomasic.

It also is argued that trial counsel's performance was deficient in his failing to make any effort to keep defendant's statement to Harper from being admitted into evidence. As already discussed, if there was any negative impact on defendant's defense from the jury's hearing about defendant's statements to Harper, it would have been from the "hypothetical" situation he volunteered. It would not have been from anything Harper said about defendant's

invoking his right to silence. Thus, if there was any deficiency in trial counsel's performance, no prejudice resulted.

Appellate counsel faults trial counsel for failing to request a *Jackson v. Denno* hearing on defendant's statement to Shomin and Tomasic. The purpose of such a hearing is to determine the voluntariness of a confession of guilt. *State v. Miles*, 233 Kan. 286, 290, 662 P.2d 1227 (1983). As already discussed, defendant told Shomin and Tomasic that he was elsewhere when Mallicoat was shot and that Reagan Brown had committed the murder. There is no confession involved. The State points out that in *State v. Martinez*, 223 Kan. 536, 575 P.2d 30 (1978), the court held there was no error in admitting an exculpatory statement without holding a *Jackson v. Denno* hearing. Moreover, as already discussed, voluntariness is not at issue.

We conclude that trial counsel's complained-of conduct in failing to attempt to exclude defendant's statements "falls within the wide range of reasonable professional assistance." *State v. Rice*, 261 Kan. 567, Syl. ¶ 14.

Appellate counsel also asserts that trial counsel failed to investigate defendant's case thoroughly. In particular, he complains of trial counsel's failure to interview persons on defendant's proposed witness list.

At the hearing on defendant's pro se motion for new trial, trial counsel testified that defendant gave him a list of potential witnesses. Asked if he discussed whether persons on the list would be called as witnesses, trial counsel answered:

"I told him in general that I didn't want to call any penitentiary inmate as a witness, because this was a case that I was going to be attacking the State's witnesses because I felt there was . . . some credibility [issue] with the [S]tate's witnesses. I didn't want to parade somebody in from a jail who you could cross examine. But I still wanted to know what they were going to testify about, and as to whether it was going to be relevant. With respect to Acree, it was my understanding he was claiming the privilege because he was present at the scene. I didn't think Acree was going to have anything that he could help us with."

The penitentiary inmate he referred to was LeAnn Garrett. Trial counsel had seen in the prosecutor's case file a letter defendant wrote to Garrett which could have been used against defendant.

Trial counsel testified that he weighed all the factors for and against her being a defense witness. The information about Acree also came from trial counsel's inspection of the State's case file.

Trial counsel told defendant that several of the people he listed were "collateral, had nothing to do with what the issue was in the case." He elaborated:

"[H]e had witnesses who could show supposedly Clinton Rice was a murderer, one of the [S]tate's witnesses; and I explained to him that that would not be admissible. And several people wanted me to track down something about Clinton Rice throwing somebody's body in a well in Raytown. That was the problem, he had a lot of things he wanted me to track down. Not much of them had to do with the defense of the case."

None of the potential witnesses listed by defendant was at the scene of the shooting. Three times trial counsel went to the parking lot where the shooting took place. It lay at a substantial distance from neighboring houses. He interviewed a neighborhood woman mentioned in a newspaper article about the shooting. She told him she did not see the incident, and trial counsel verified that the parking lot was not visible from her house. The first seven names on defendant's list were other people who lived in the area. Trial counsel did not interview them because he knew they could not have seen the shooting. In addition, he did not interview them because "by that time [defendant] was admitting that he did it."

Trial counsel was asked whether he thought it was important for the jury to hear that defendant had not been looking for the victim earlier on the day of the shooting. He replied that it was and that the evidence was introduced through his cross-examination of prosecution witnesses and defendant's testimony.

The State points out that none of the witnesses from defendant's list was called to testify at the hearing on the motion for new trial. Nor was there any proffer of what those witnesses might have added to defendant's defense.

At the conclusion of the hearing on defendant's motion for new trial, the district court judge expressed his belief that none of the complaints about counsel's performance had any merit:

"I think an attorney has an obligation when he is representing an accused to exercise his or her own independent professional judgment about what is best

when it comes to matter[s] of law. And when it comes to matter[s] of strategy, certainly an attorney has to listen to his client and take into account and consider what the client says and what the client requests, but the attorney has to exercise his or her professional judgment."

In the trial judge's opinion, counsel's decisions with regard to witnesses were in fulfillment of his obligation to exercise professional judgment on behalf of his client. We agree. Furthermore, nothing has been shown to indicate that different tactics would have affected the result.

Appellate counsel raises other instances of trial counsel's performance that were not argued to the trial court. They are the failure to object to Harper's testimony about defendant's invoking his right to silence and the failure to request a jury instruction on the burden of proof for self-defense. As already discussed, there was no harm from elimination of the jury instruction. And, also as already discussed, the alleged harm did not result from Harper's mentioning defendant's invoking his right. Thus, even if it could be said that trial counsel's failure to object constituted deficient performance, there would be no prejudice from the failure.

We next address the issues raised by defendant pro se. Defendant first argues that he was denied a fair trial by prosecutorial misconduct. Defendant contends that the prosecuting attorney lied to the jury when he said that defendant's motive for killing Mallicoat was that he had gotten nothing in return for a large sum of money he gave the victim to produce some drugs. Defendant contends that the falseness of the prosecutor's representation is shown by the evidence, which contradicted it. According to defendant, the evidence showed that Mallicoat was involved in the making and selling of methamphetamine and that at the time of his murder he had a large amount of methamphetamine on hand. There is no contradiction of the key element of the suggested motive, which is that defendant had gotten nothing out of the deal. At best, the evidence described by defendant establishes that Mallicoat had drugs that he could have given to defendant.

Examination of the record shows that two of the three instances of what defendant calls lies by the prosecuting attorney are in fact the testimony of a witness and the recounting of testimony. In the

first instance cited by defendant, Detective Shomin was asked about Clinton Rice's statement, and he simply summarized what he had been told. In the second cited instance, the prosecuting attorney said in closing argument: "We have heard from other witnesses that there was a large amount of money given to Lonnie for a drug deal by Jeff [Sperry] for a drug deal." The prosecuting attorney continued by saying that defendant denies this.

In the third instance cited by defendant, the prosecuting attorney stated in closing argument:

"So why wasn't it done behind the building as [defense counsel] asks? Who knows[?] Jeffrey Sperry can only be the only one that can honestly answer that. If we get an honest answer out of Jeffrey Sperry. I suggest that Jeffrey Sperry still wanted his dope or his money and still wanted to get it, and it wasn't until Lonnie [Mallicoat] was trying to drive away from that, that he had the last straw and pulled the trigger."

The prosecutor's suggesting that defendant wanted his drugs or his money is nothing more than a rephrasing of Shomin's testimony about Rice's statement.

Defendant also complains about the prosecuting attorney's stating these facts in opening statement and then failing to support them with evidence. He does not give a transcript citation for the alleged remarks in opening statement. In any event, Shomin's testimony about Rice's statement was supporting evidence.

For all the reasons stated, there is no prosecutorial misconduct in the conduct complained of by defendant.

Defendant next contends that Shomin's testimony about Brown's statement was false, that her actual statement substantiated defendant's defense of self-defense, and that the prosecutor knew Shomin's account was false but let it stand. Defendant characterizes this as the State's using perjured testimony. According to defendant, when Brown testified, the story got straightened out. The damage already had been done, however, because the differing versions of her statement to police damaged Brown's credibility.

In fact, Shomin testified that he had interviewed Brown on more than one occasion and that her story did not stay the same from

one time to another. Shomin testified that the first time he talked with Brown was 2 days after the shooting. At that time,

"[s]he advised that they did go to the building there at . . . 25th and New Jersey and that Jeff had exited the car. And she said that they had come out, there was some arguing, and that the victim got into his vehicle, and that she heard a gunshot; that at that point in time she didn't actually see Jeff shoot the man, but surmised it."

The next time Shomin spoke with Brown was in May 1996. Brown told him in May that "she did see the shooting actually take place, saw the suspect Sperry walk to the window. Something occurred there, and then observed the victim back out of the lot, and at this point saw the suspect shoot the victim, Sperry shoot him." Then, when Brown testified at trial, she gave still another version of the shooting.

There is nothing to indicate that Shomin's testimony was perjured. Brown's credibility was damaged by her own inconsistent stories.

Defendant also complains about some perceived misstatement of the order in which witnesses were interviewed by law enforcement persons. It is not at all self-evident that the interview times have any relevance, and defendant does not suggest that they do.

Defendant complains of a portion of the prosecuting attorney's closing argument where he was responding to defense counsel's argument:

"Nick Tomasic is [a] liar? Mike Shomin, your homicide detective from Kansas City, Kansas, he's a liar? Everyone else is a liar but Jeffrey Sperry. Fine upstanding citizen that he is, self-employed contractor. Oh, he dabbles on the side with a little bit in not-so-legal drugs, but he's telling the truth.

"[Defense counsel] told you a nice story about what the defense attorneys say that their clients get convicted for what they say and not what they do. He is asking you to ignore everything else and just listen to what he said on the stand because that is believable, whether you like it or not, that's believable. You can't do that, you got to take in account everything he said, and you got to take in account that he's lied all along and how he tried to get out of it. He's gone along and found out his first lie is not going to work that Reagan did it. I will tell them I wasn't there, because they're not going to have Reagan there. That's not true, that's not going to work. He gets down to the end, and he said he's got to tell he did it so it's self-defense. That in itself is enough to make you disbelieve everything Jeffrey Sperry says. He has no credibility."

Defendant relies on *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). In that case, the court stated: "Under the facts of this case, where the prosecuting attorney called the defendant and the defense counsel liars in his concluding argument, the defendant was denied his right to a fair trial as a result of prosecutorial misconduct." Syl. ¶ 3. In *Lockhart*, the defendant was charged with possessing rock cocaine, and he denied it. Police testimony was that Lockhart was stopped for traffic violations, and he jumped from the car. As Lockhart ran, police saw him reach toward his mouth and then fling something. Rock cocaine in plastic was found in a nearby bush. The Court of Appeals gave the following account of the prosecutor's closing argument at trial:

"A reading of the transcript of the trial reveals that the trial was hard fought and contentious. During his initial closing comments, the prosecutor referred to the defendant as a liar and drug dealer. He advised the jury that Lockhart had had 1 year and 2 months to think about the defense he was going to raise and what lies he could perpetrate. He commented in his argument that the defense counsel had attempted to penetrate the facts with 'fog, smoke, or mirrors.' He asked the jury to put itself in the place of a drug dealer to determine the credibility of Lockhart's statements. All of these comments were made without objection.

"The transcript of the prosecutor's concluding remarks also reveals the following:

'MR. RUES: I'll tell you what a rare moment is, ladies and gentlemen, defense counsel wants you to think that an officer lied. You think that's a rare moment. I'll tell you what isn't a rare moment, for defense counsel to lie for the defendant up here. To start—

'MR. ROSEL: Judge, I will object. I will object—

'THE COURT: Sustained.

'MR. ROSEL: And ask that that be stricken, and I would move for a mistrial based upon counsel's implication that defense counsel has lied before this jury. Move for a mistrial immediately.

'MR. RUES: That was not the implication—

'MR. ROSEL: Move for a mistrial.

'THE COURT: No, I'll sustain the objection and take the motion under advisement—

'MR. ROSEL: And ask that that be stricken and that that not be considered—

'THE COURT: I'm sorry, you don't need to interrupt. I was making my ruling. I will strike it, but I will take the motion under consideration. You may continue, Mr. Rues.

'MR. ROSEL: Judge, I would ask that you admonish Mr. Rues to not make comments about what he believes defense counsel has done or what the truth of defense counsel's comments are.

'THE COURT: Mr. Rues, you may continue.

'MR. RUES: Thank you, Your Honor. The defendant has lied. He said he's not any drug dealer. Defense counsel got up here and told you what the defendant did. Well, he lied, ladies and gentlemen. The defendant lied. He's a drug dealer. That's not a rarity. That's what took place.' " 24 Kan. App. 2d at 490-91.

The Court of Appeals viewed the "prosecutor's comments referring to the defendant and the defense counsel as liars to be serious breaches of the standard of fair comment permitted to lawyers when making closing arguments." 24 Kan. App. 2d at 492. The remarks were gross and flagrant, they revealed ill will on the prosecutor's part, and the Court of Appeals could not conclude beyond a reasonable doubt that the remarks had no effect on the verdict.

In the present case, the prosecuting attorney's concluding argument contained sarcastic remarks about defendant's character that are of a somewhat questionable nature. For example, the prosecutor referred to him as a "[f]ine upstanding citizen" and a "self-employed contractor." What the prosecuting attorney said about defendant's accounts of the shooting, however, was not characterization, and it is not comparable to the remarks in *Lockhart*. He simply pointed out that defendant gave different accounts at different times so that he undermined his own credibility. This is not a breach of the standard of fair comment.

Defendant complains that the prosecutor improperly injected his personal beliefs into the trial, but he fails to state when this was supposed to have happened or to give a citation to the record. In any event, his complaint would not seem to have any significance for the verdict. Defendant contends that "the prosecutor stated that it was his belief that the defendant made those a.m. calls [to Rice and Williams] from some motel room." He contends that there is no evidence of his being in a motel room.

Defendant complains that the prosecutor misstated Officer Heaton's testimony about tire tracks. Officer Heaton worked in the Accident Investigation Unit. Defendant quotes Heaton as stating, "To be honest, you wouldn't be able to specifically tell if it was

going in forward or reverse because nobody else had been there." And he contrasts Heaton's statement with this sentence from the prosecutor's closing argument: "There is no evidence of a forward lurch by the tire marks in the lot that the officer testified to."

When the one sentence of Heaton's testimony is placed back into context, the apparent contradiction is explained. Heaton was asked and answered:

"Q. Are you able to say whether a car is in forward or reverse when you see marks like that?

"A. On the dirt it is not going to leave its prevalent characteristics on the dirt, but because the fact that they were fresh and no other vehicles had been on there, I also looked at the tread pattern and it matched what was there. To be honest, you wouldn't be able to specifically tell if it was going in forward or reverse because nobody else had been there. *There was only one way the vehicle could have gone is reverse.* On asphalt you can tell a little bit different." (Emphasis added.)

It appears that he gave a generalized theoretical answer to a question of the same type and then added that, in that specific instance, however, something about the configuration of the scene limited the possibilities to one—reverse. Defendant's complaint has no merit.

In closing argument, the prosecutor stated the following with regard to the element of premeditation:

"The second element that we have to prove, premeditation. Now, for the definition again, is in Number 12, it talks about premeditation and what it says is that the defendant has to think the matter over beforehand. Please don't get confused and say then, premeditation means that he has to come up with a plan, and he has to write this plan down, and he has to get others involved in the plan, or he has to exclude others from the plan. All it simply says that you have to think about the matter beforehand."

Defendant complains about the prosecutor's saying that premeditation should not be equated with his having to come up with a plan. The prosecuting attorney's comments, however, did not deviate from the approved pattern instruction, which provides that "premeditation means to have thought over the matter beforehand." PIK Crim. 3d 56.04(b) (1994 Supp.). In *State v. Patterson*, 243 Kan. 262, 269, 755 P.2d 551 (1988), this court approved this

instruction, noting that it correctly stated the law. Thus, the prosecutor's comments were proper.

Defendant's second pro se issue is whether the trial court's various omissions and commissions denied him a fair trial. Building on the complaints raised in the first pro se issue, defendant argues that he was denied a fair trial by the trial judge's failing to intervene to stop prosecutorial misconduct irrespective of the absence of objection. Defendant cites *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993). *Ruff* involved improper closing argument by the prosecuting attorney. Defense counsel made a timely objection that was not sustained by the trial judge. At the conclusion of a long discussion of the duty of a prosecutor "to insure that only competent evidence is submitted to the jury," the court noted that "[t]he improper remark by the prosecutor in his summation to the jury would not have provided a basis for reversal of Ruff's conviction if the trial judge, rather than approving the remark after defense counsel objected, had instructed the jury to disregard the remark." 252 Kan. at 636. In other words, the question whether the trial judge has a duty to step in without a timely objection was not considered in *Ruff* .

In *State v. Heath*, 264 Kan. 557, Syl. ¶ 14, 957 P.2d 449 (1998), we stated: "Kansas does not follow the 'plain error' rule; reversible error cannot be predicated upon prosecutorial misconduct during closing argument where no contemporaneous objection has been lodged."

However, in *State v. Price*, 24 Kan. App. 2d 580, 948 P.2d 1145 (1997), *rev. denied* 263 Kan. 890 (1998), the defendant did not object to the comments by the prosecutor in closing argument, but the Court of Appeals nevertheless considered the issue, stating:

"However, regardless of whether there is a contemporaneous objection lodged, the prosecutor and the trial judge have independent duties to protect a defendant's right to a fair trial. In *State v. Wilson*, 188 Kan. 67, 73, 360 P.2d 1092 (1961), the court stated:

'It is, the duty of the county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve.'

"Then, addressing the duty of a trial judge, the *Wilson* court stated:
' "Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion." ' 188 Kan. at 73." 24 Kan. App. 2d at 582.

We note that in *Wilson*, the defendant did object to the prosecutor's comments, and the above-quoted portions of *Wilson* are dicta. We also note that the second paragraph quoted above is quoted by the *Wilson* court from *State v. Gutekunst*, 24 Kan. 252, 254 (1880), and the statement was also dicta in that case. Finally, in *State v. Netherton*, 128 Kan. 564, 573, 279 Pac. 19 (1929), cited by the *Wilson* court, the defendant did not object to the prosecutor's comment until after the jury had retired. The court found no contemporaneous objection was necessary to preserve the issue on appeal. The objection made after the jury had retired was sufficient. The court granted the defendant a new trial, stating:

"Appellee pleads justification on the ground of provocation by the remarks of the attorneys for the defendant. This has sometimes been recognized as a legitimate excuse, even in a criminal case, for some rash, extravagant, inflammatory, or prejudicial remarks in a sudden outburst of retaliation, but hardly for an extended repetition or a series of objectionable statements along several different lines. We think the failure of the court to admonish the jury to disregard these remarks was error, even if the jury had retired from the room before the request was made." 128 Kan. at 575.

Where prejudicial conduct would make it impossible to proceed without injustice to either party, the trial court may stop a trial and order a mistrial. K.S.A. 22-3423(c). However, where such conduct amounts to a violation of a defendant's constitutional rights or is so gross and flagrant as to undermine the fundamental fairness of the trial, intervention by the trial court is no longer discretionary.

We agree with the rationale of the *Wilson* court and the cases cited therein. The right to a fair trial is a fundamental constitutional right which the trial court has a duty to protect regardless of a defendant's failure to contemporaneously object. The trial court has a duty to intervene where a prosecutor's comments amount to a constitutional violation or are so gross and flagrant that they im-

permissibly infringe upon a defendant's constitutional right to a fair trial. Ordinarily, we do not apply the plain error rule. We are, however, by this decision, applying the plain error rule where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation which, if not corrected, will result in injustice or a miscarriage of justice. Here, the prosecutor's conduct did not rise to a level requiring intervention by the trial court or this court.

Defendant cites *State v. Burton*, 63 Kan. 602, 66 Pac. 633 (1901), for the proposition that he should have been permitted to introduce evidence about Mallicoat's involvement in two Missouri homicides. Burton was convicted of first-degree murder of Fred Hoffman, his rival for a woman's affection. Burton testified that he shot Hoffman because he believed his life was in danger. In support of his defense of self-defense, Burton was allowed to show that Hoffman had made threats against him. The trial court, however, excluded Burton's evidence that he knew Hoffman had a reputation for being a violent and turbulent man. This court reversed the conviction. It agreed that the general rule was "that the character of the person killed can only be attacked by evidence of his general reputation in the neighborhood, and cannot be proved by specific acts of violence or turbulence, or by isolated facts, nor by the individual opinions of those who are acquainted with him." 63 Kan. at 608. Then it discussed the applicable exception:

"If the defendant was justified in acting on the appearances presented at the time of the killing, then the knowledge he had theretofore gained concerning the violent and dangerous character of the deceased tended to show his state of mind and his good faith in the belief of his imminent danger when he fired the fatal shot." 63 Kan. at 608-09.

A more recent case is instructive in this matter. In *State v. Arteaga*, 257 Kan. 874, 896 P.2d 1035 (1995), the defendant sought to show another man's prior conviction for domestic battery, but the trial court excluded the evidence. On appeal, this court stated that the governing principles were that "when self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Specific instances of misconduct may be shown only by evidence of a conviction of a crime." 257 Kan. at 894. Even though Arteaga's evidence was admissible, this court

concluded that the district court had not abused its discretion in excluding it.

In the present case, the evidence defendant wanted to present to the jury was that he had told law enforcement persons that Mallicoat had committed two murders in Missouri. Like Arteaga, defendant sought to show specific instances of conduct; unlike Arteaga, defendant did not offer to show conviction of a crime.

Defendant contends that the rule of *United States v. Swint*, 15 F.3d 286 (3d Cir. 1994), applies to the present case and precludes the State's use of the statements he made to Shomin and Tomasic. At issue in *Swint* were statements Swint made to law enforcement officers, including federal agents, during a meeting that had been arranged by a state district attorney. Swint's attorney knew of the meeting but did not attend because its purpose was "for Swint to make an off-the-record proffer regarding the cooperation he could provide in exchange for a negotiated plea on the outstanding state charges against him." 15 F.3d at 287. The court noted that "[s]uch off-the-record meetings are customary" in this particular county. 15 F.3d at 287. When the government sought to use statements Swint had made at that meeting in a federal prosecution, the district court suppressed the statements, and the Court of Appeals affirmed on the ground that, under the circumstances, they were not voluntary due to law enforcement overreaching.

Defendant contends that his meeting with Shomin and Tomasic was off the record because in the note he sent to Shomin initiating the meeting, he stated: "There isn't any need for my attorney for the initial talk as it will be off the record." There is no comparison between the circumstances of this case and the circumstances of *Swint*. There, Swint gave a statement relying on the assurances of law enforcement authorities that what he said was off the record. Then law enforcement agents attempted to use his statement in order to obtain his conviction. Here, defendant told the law enforcement authorities that the meeting would be off the record, but there is no evidence that they agreed to that condition. As previously noted, the statements made by defendant to Shomin and Tomasic were introduced into evidence by defendant. Defendant's contention has no merit.

The trial court received the following question from the deliberating jury: " 'What is reasonable doubt?' " The trial judge proposed the following response: " 'I can only refer you to the instructions previously given. You must consider them as a whole.' " Noting that the pattern instructions recommend that no definition of reasonable doubt be given (PIK Crim. 3d 52.04), defense counsel agreed that the response was appropriate and stated that he had conferred with defendant. In *State v. Myers*, 258 Kan. 51, Syl. ¶ 1, 899 P.2d 1036 (1995), the court stated: "Under K.S.A. 22-3420(3) a trial court has a mandatory duty to respond to a jury's request for further information as to the law of the case. The manner and extent of the trial court's response rest in the sound discretion of the trial court." Keeping in mind this court's approval of the pattern instruction in *State v. Banks*, 260 Kan. 918, 927 P.2d 456 (1996), a reasonable person might well agree with the trial judge's response. No abuse of discretion has been shown.

The trial court received the following question from the deliberating jury: " 'If there is disagreement between jury members as to the verdict of murder in the first degree or murder in the second degree-intentional, is the jury directed to select the lesser offense?' " The trial judge proposed this response: " 'Again, I can only respond by referring you to the instructions as a whole that were previously given.' " Defense counsel agreed and stated that he had conferred with defendant.

Defendant argues that the trial judge was under an obligation to tell the jury that the answer to their question was "yes." The answer he advocates oversimplifies the process the jury already had been instructed to follow. The jury was instructed on five degrees of homicide, was instructed to consider them in descending order of severity, and was instructed that "[w]hen there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only." The trial judge's response was proper.

Defendant also claims he was denied effective assistance of trial counsel on grounds not raised by appellate counsel. Defendant complains that trial counsel objected only two times and failed to object to the instances of prosecutorial misconduct and trial court

error he has alleged in the first two issues of his pro se brief. Since we determined that there was no merit to any of those allegations, failure to object did not prejudice defendant.

Defendant also complains of trial counsel's failure to file any pretrial motions. He identifies two issues that should have been subjects of counsel's pretrial motions. One is his interview with Shomin and Tomasic. He contends that trial counsel should have filed a motion to suppress it. The second is the part of his interview with Shomin and Tomasic where defendant told them that Mallicoat committed murders in Missouri. He contends that trial counsel should have ensured its admission into evidence by filing a pretrial motion. Aside from the internal inconsistencies of his allegations, these issues have been considered by the court in the first two issues of the pro se brief. We determined that there was no merit to those allegations, and thus we need not consider this issue. As defendant points out, citing *Kimmelman v. Morrison*, 477 U.S. 365, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986), failure to file a pretrial motion to suppress is problematic only if it would have been predicated upon a meritorious suppression claim.

Defendant additionally complains that defense counsel "pitted himself against the pretrial motions defendant filed pro se." To support his assertion of trial counsel's "pitting himself" against the pro se motions, defendant cites to his own testimony during the hearing on his motion for new trial:

"He had promised me that he was going to file some motions, which never got filed, but when we went for this, it was on the Wednesday before the trial started, we went to that motion hearing. It was only on the pro se motion that I had filed, and he himself wiped out most of the motions or dismissed them."

The only other record reference given by defendant is to a portion of trial counsel's testimony at the same hearing:

"We spent most of our initial visits arguing about trying to exclude Reagan Brown's testimony based on him claiming her Fifth Amendment rights, which I advised him he didn't have the right to do; but in addition, I told him her statement was the only one that supported the self-defense theory, and I thought she was our best witness on self-defense, and I couldn't understand why we wanted to keep that witness out."

Defendant strongly contends that he knew better than to try to assert Brown's Fifth Amendment rights for her. Nonetheless, he argues that when Brown's rights were violated, his right to a fair trial was denied. He cites no authority for his position.

Defendant also complains that trial counsel did not object to the trial judge's proposed responses to the questions from the jury. The trial judge's responses were discussed in appellate counsel's Issue 2. We concluded that there was no merit to any of those allegations.

Defendant further contends that trial counsel did not interview the State's witnesses in preparation for trial. He cites the transcript of trial counsel's testimony on the motion for new trial in support. Examination of the record, however, does not seem to bear out his contention. Trial counsel was questioned about what he did with the list of potential defense witnesses that was supplied to him by defendant, but it does not appear that he was asked about the State's witnesses.

There was evidence that Mallicoat had cocaine and methamphetamine in his system when he died. Defendant complains that trial counsel failed to obtain an expert witness who would have testified about irrational behavior produced by drug abuse. He also is critical of trial counsel for failing to cross-examine the pathologist on this subject after he testified on direct examination about the toxicological report on Mallicoat.

Defendant seems to think that it is self-evident "that evidence of this nature would be extremely helpful to defendant's theory of self defense." He does not explain its relevance, and we find none.

Finally, defendant's complaint about the lack of cross-examination seems to be based on a faulty assumption that questions about behavior resulting from drug abuse would be within the scope of direct examination about the toxicology report. It also assumes without any basis that the pathologist, who works with corpses, would be qualified to testify about drugged behavior in living persons.

The judgment of the district court is affirmed.