NOT DESIGNATED FOR PUBLICATION

No. 120,158

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MANUEL L. TROTTER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed June 10, 2022. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ATCHESON and HURST, JJ.

PER CURIAM: Manuel L. Trotter appeals from his convictions related to the shooting death of his friend and roommate Joseph Seabolt. He contends that the trial court erred because it denied his motion for self-defense immunity and proceeded to trial. We disagree and affirm. He further argues that the State did not present enough evidence for the jury to find him guilty of criminal discharge of a weapon. We disagree and affirm. He also argues that the State did not present enough evidence for the jury to find him guilty of aggravated battery. We disagree and affirm. Also, he argues that the State committed prosecutorial error, jury instruction error, and cumulative error involving his

1

conviction of involuntary manslaughter. We agree. Because cumulative errors deprived Trotter of his right to a fair trial, we reverse his conviction for involuntary manslaughter, vacate his sentence for involuntary manslaughter, and remand for a new trial on that conviction.

Finally, he argues that the statute mandating criminal restitution is unconstitutional. We decline to address this issue based on our having reversed his conviction of involuntary manslaughter. So we affirm in part, reverse in part, vacate in part, and remand with directions.

## FACTS

On May 31, 2017, Joseph Seabolt and his brother David were at a birthday party for a friend at the duplex where Joe lived. The duplex consisted of an upstairs and a downstairs unit. Joe fought with his brother that day. Joe also fought with his roommate, Trotter. Trotter eventually shot Joe. Before trial, Trotter claimed that he shot Joe to defend himself and his girlfriend, Sydnie Klos.

Trotter and Klos lived together in the downstairs unit of the duplex. Trotter and Klos hung a tapestry to block off the living room and lived in it as though it were a bedroom. Joe also lived in the downstairs unit with Trotter and Klos, but he had his own bedroom. Both Trotter and Joe normally carried handguns.

David arrived at the party at around 5 p.m. The birthday party was in the upstairs unit of the duplex. At the party, alcohol, marijuana, and MDMA were consumed. According to party attendee Tyler Frasher, Joe and David had an argument about how to socialize a dog and a cat in the upstairs unit. Hours into the party, David saw Joe in a "somewhat heated" conversation with Frasher outside the duplex. David walked over to see why his brother was so angry. Joe turned his attention to David, shoving his brother

2

to the ground before hitting him a few times. Joe's attack ended when other people pulled Joe off his brother. Frasher testified that this fight was an extension of the argument over how to get the dog and the cat to warm up to each other.

After this altercation, Frasher felt "very uncomfortable" and went home. David went to the downstairs unit where people were playing video games. Joe, however, began arguing with Trotter. David heard a gunshot from outside. David went outside to see Joe and Trotter arguing and "they maybe shoved one another a couple of times, but it didn't get too violent at that point." Trotter said that he was going to bed and walked downstairs, while David and Joe remained outside.

David spent 10 to 15 minutes trying to convince his brother to leave with him, but instead Joe went downstairs to confront Trotter. David lingered outside for a moment before following. David saw Joe and Trotter in a fist fight in the basement. Trotter eventually got Joe into a chokehold where Joe's face turned blue, and it looked like Joe was losing consciousness. Klos had been sleeping through the party because she did not feel well. She woke up to see her boyfriend fighting with Joe. Trotter released Joe when Klos and David begged him to.

After Trotter released Joe from the chokehold, he went to his room and returned with a rifle. While Joe was on the ground, Trotter wielded the rifle like a club, striking Joe in the face multiple times with the barrel of the rifle. Then Trotter went back into his room. This confrontation was the basis for the State charging Trotter with aggravated battery, in violation of K.S.A. 2016 Supp. 21-5413(b)(1)(B).

Joe went to the tapestry that served as a door to Trotter's room and told Trotter to come out. David testified that Joe jabbed the tapestry with his fingers as he talked to Trotter. Klos was in the room with Trotter and testified that Joe was waving a gun

3

through the tapestry while screaming at Trotter. Trotter pushed aside the tapestry, took a couple steps out of his room, pointed the rifle at Joe's abdomen, and fired.

Joe dropped to the ground and told Trotter to "put one in his head." Trotter went into his room and began packing, telling Klos that they needed to go. Trotter and Klos loaded their TV, electronics, and some guns into their car and drove to Klos' parents' home in Peck, Kansas. David and another friend took Joe to the hospital, despite Joe's protests. Klos testified that Joe struggled against being taken to the hospital, asking to be left to die because he did not want to go back to jail. Joe had an Indiana warrant for intimidation of a minor with a deadly weapon.

Joe continued to be combative in the car and at the hospital, fighting with security and the nurses. Joe died at the hospital several hours later. The autopsy showed the cause of death was a gunshot wound to his torso. Joe's blood alcohol content was 0.245, with THC and a cocaine metabolite also in his system.

Police arrested Trotter in Peck the next day. Police found the rifle and two other guns in his car, including the 9 mm pistol that Joe normally carried. The State charged Trotter with involuntary manslaughter, in violation of K.S.A. 2016 Supp. 21-5405(a)(1).

During their investigation, police found bullet strikes on the door to the basement unit and the stairwell just outside that door. Trotter told police that he was locked out of his unit at one point during the party, so he tried to shoot his way through the lock even though he knew people were inside. Also, Trotter testified at trial that he tried to shoot his way through the lock, knowing that people were inside the unit. For this action, the State charged Trotter with criminal discharge of a firearm, in violation of K.S.A. 2016 Supp. 21-6308(a)(1)(A).

4

Trotter moved to dismiss the involuntary manslaughter charge, arguing that he was immune from prosecution because he acted in defense of himself and Klos. After a hearing, the trial court denied Trotter's motion to dismiss. A jury convicted Trotter of all charges. The trial court sentenced Trotter to 64 months in prison.

Trotter timely appeals.

ANALYSIS

*Did the trial court err in finding that Trotter was not immune from prosecution?*

Trotter argues that the trial court erred in finding that he was not immune from prosecution. He contends that the trial court did not properly apply the legal test, did not resolve conflicts in the evidence, and misapplied statutory presumptions. As a remedy, Trotter asks us to remand for further findings on self-defense immunity. The State responds that the trial court sufficiently articulated its ruling, making remand unnecessary.

In reviewing a trial court's ruling on a motion to dismiss based on immunity under K.S.A. 2016 Supp. 21-5231, appellate courts apply a bifurcated standard of review of the trial court's probable cause determination. Accordingly, when the lower court's factual findings arise out of disputed evidence, the appellate court will determine if the findings are supported by substantial competent evidence. The appellate court will not reweigh the evidence. The ultimate legal conclusion of whether the facts so found arise to the level of probable cause is a legal conclusion reviewed de novo. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

When there are no disputed material facts on a motion under K.S.A. 2016 Supp. 21-5231, the appellate court is presented with a pure question of law over which it exercises unlimited review. 305 Kan. at 1012.

When evaluating a claim of self-defense immunity under K.S.A. 2016 Supp. 21-5231, the trial court must exercise its gatekeeping function and consider the totality of the circumstances, weigh the evidence without deferring to the State, and determine whether the State has established probable cause that the defendant's use of force was not statutorily justified. 305 Kan. at 1011.

To overcome a defendant's immunity claim under K.S.A. 2016 Supp. 21-5231, the State must establish probable cause that an ordinarily prudent and cautious person could reasonably believe the defendant's use of force was not justified under either or both of two scenarios: (1) The defendant did not honestly believe the use of force was necessary under the circumstances or (2) a reasonable person would not believe the use of force was necessary under the circumstances. *State v. Thomas*, 311 Kan. 403, 156, 462 P.3d 149 (2020).

K.S.A. 2016 Supp. 21-5222 outlines when the use of force is justified as follows:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

K.S.A. 2016 Supp. 21-5231 provides immunity from criminal prosecution to a person who uses force which is justified under K.S.A. 2016 Supp. 21-5222. And K.S.A. 2016 Supp. 21-5224(a)(1) provides circumstances under which a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm. This reasonable belief presumption applies when using force against someone who:

> "(A) Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force; or
>
> "(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force." K.S.A 2016 Supp. 21-5224(a)(1).

Trotter argues that the trial court did not address the two-part test of (1) whether Trotter honestly believed that it was necessary to defend himself with deadly force and (2) whether a reasonable person would believe the use of deadly force was necessary. He also claims that the trial court failed to resolve disputed facts. And he asserts that the trial court confused the presumptions of immunity with immunity itself. That is, Trotter claims that the trial court ruled that he was not entitled to immunity under K.S.A. 2016 Supp. 21-5231 simply because the presumptions of immunity under K.S.A. 2016 Supp. 21-5224 did not apply.

The trial court made the following findings regarding immunity:

> "[T]he Defendant testified the Decedent never came into the make shift bedroom area but was poking the sheet/tapestry with the barrel of some weapon and making statements about one of them 'taking a bullet', which the Defendant interpreted as meaning either he or his girlfriend would be shot. Decedent also lived in another bedroom in the basement of that duplex.

7

"Defendant's girl friend said she never saw the decedent with a gun but believes she saw the imprint of the barrel of a gun against the tapestry/sheet and that she saw the outline of a firearm through the tapestry/sheet.

. . . .

"Defendant went out beyond the tapestry/curtain, after trying to get his girlfriend into a closet for her safety, and saw the Decedent holding a gun. He thought either he or his girlfriend, Sydnie, was going to be shot.

"Accordingly, the presumptions under K.S.A. 21-5224 come into consideration but never fruition.

. . . .

". . . . Defendant, the girlfriend and the Decedent all had lawful right to be present in this area. No one was armed during the first incident. Only the Defendant was armed for certain for the second incident. It is disputed whether the Decedent was armed during the third incident.

. . . .

". . . . David Seabolt's recollection of the event was that the Decedent, Joe Seabolt, did not have any weapon he saw. . . .

"David Seabolt said his brother, Joe, was poking the tapestry/curtain with his finger then David said he saw the tapestry/curtain open and Manny, the Defendant, walk out with an assault rifle, point it at Joe and shoot him one time.

. . . .

"This is a probable cause hearing.

"This is not a hearing to establish anything beyond a reasonable doubt.

"There is significant dispute—if not diametrically opposed views—of material fact: i.e.—was Joe Seabolt armed when Manny Trotter shot him or was he unarmed; did reasonable basis for fear of imminent bodily harm to either Manny Trotter or Sydnie Klos from Joe Seabolt exist at the time of the shooting to justify this use of force?

"Based on the Defendant's testimony and his statement to police, there were several times during the evening when he had concern over Decedent's behavior and comments relative to him and/or the Defendant's girlfriend about their safety and whether Decedent would harm them. Defendant and the girlfriend had opportunities before the third physical confrontation between the Defendant and the Decedent to leave. For whatever reason, they didn't try until very shortly before the 3rd and final and fatal incident.

"Based on the standards and procedure set out in the *Hardy* case, this Court finds the state has shown and established probable cause that Defendant's use of force was not statutorily justified relative to this motion for immunity from prosecution."

A trial court is not required to make particularized findings on an immunity motion if it is apparent from the record that the trial court applied the appropriate legal standard in determining probable cause. *State v. Nunez*, 313 Kan. 540, 548, 486 P.3d 606 (2021).

Here, the trial court applied the correct legal standard. The trial court may not have expressed each of its factual findings point by point, but it did resolve conflicts in the evidence. The trial court's conclusion entails the finding that Joe was unarmed, or, more accurately, that the State produced enough evidence that Joe was unarmed to meet its probable cause burden. Trotter's complaint that the trial court did not resolve conflicts in the evidence is unpersuasive.

Similarly, the trial court correctly applied the two-part test, despite Trotter's contention of error. The trial court discussed the timing of Trotter and Klos' decision to leave, weighing that as evidence about the subjective belief that Joe would harm them. The trial court did not imply, as Trotter claims, that they had a duty to retreat. The trial court also pointed to the objective question of a "reasonable basis for fear of imminent bodily harm" to Trotter or Klos. The trial court did rule on whether Trotter had a subjectively and objectively reasonable belief that the use of deadly force was necessary.

Finally, the trial court's application of the two-part test undermines Trotter's complaint that it misapplied the statutory presumptions. The trial court ultimately decided that Joe was not unlawfully entering Trotter's dwelling. All parties had a legal right to be in the basement unit since all of them lived there. In that case, Trotter was not entitled to the statutory presumption of a reasonable belief that deadly force was necessary. But,

9

contrary to Trotter's claim, the trial court did not end its analysis there. The trial court discussed Joe's violence, his threats, and the possibilities that he was armed or unarmed. The trial court's rulings that Trotter was not entitled to statutory presumptions and that Trotter was not entitled to immunity were independent rulings. The trial court made its findings sufficiently explicit that remand is unnecessary. Thus, we deny Trotter's request to remand for further findings on self-defense immunity.

*Did the trial court err in instructing the jury on self-defense?*

Trotter argues that the trial court did not properly instruct the jury. The trial court instructed the jury in the use of force in defense of a person. But the trial court did not instruct the jury on the burden of proof for Trotter's claim of self-defense, which Trotter claims is reversible error. The State asserts that our Supreme Court has held that failing to instruct on the burden of proof is not reversible error. Trotter's argument and the State's argument both have their flaws.

When a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018). The "clearly erroneous" principle is not a standard of review, i.e., a framework for determining whether error occurred. Instead, it supplies a basis for determining if an error requires reversal of a conviction. *State v. Williams*, 295 Kan. 506, 510, 515-16, 286 P.3d 195 (2012); see *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014).

In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3)." *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The clear error determination must review the impact of the erroneous instruction in light of the entire record including the other

instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015).

Omitting a jury instruction is clearly erroneous when "'the reviewing court is firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given.'" *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (explaining that the test could be phrased as "'whether the reviewing court is firmly convinced that the jury would have reached a different verdict'" with no practical difference between the tests).

Because Trotter raises this issue for the first time on appeal, we review for clear error. Trotter requested that the trial court instruct the jury on self-defense but did not request an instruction on the burden of proof for the defense. Trotter argues that the trial court erred because it did not instruct the jury that the State bore the duty of proving beyond a reasonable doubt that he did not act in self-defense.

Instruction No. 4 told the jury what the State was required to prove:

"The defendant is charged with involuntary manslaughter. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:
1. The defendant killed Joseph W. Seabolt.
2. It was done recklessly.
3. This act occurred on or about the 1st day of June, 2017, in Sedgwick County, Kansas."

Instruction No. 5, based on PIK Crim. 4th 52.200, explained the theory of self-defense as follows:

"Mr. Trotter claims his use of force was permitted as self-defense and/or defense of another as to count 1 involuntary manslaughter. Mr. Trotter is permitted to use against

another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself and/or someone else from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense or defense of someone else, there is no requirement to retreat."

The Notes on Use for PIK Crim. 4th 52.200 state the following: "If this instruction is used, PIK Crim. 4th 51.050, Defenses—Burden of Proof, should be given." But Trotter did not request, and the trial court did not give, PIK Crim. 4th 51.050.

Instead, Instruction No. 3 gave the general burden of proof as follows:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Trotter contends that the general burden of proof instruction was insufficient, and the trial court erred by not giving PIK Crim. 4th 51.050, which specifies how the reasonable-doubt standard should apply to the self-defense instruction.

In 2018, when Trotter's trial was conducted, PIK Crim. 4th 51.050 read as follows:

12

"The defendant raises [describe the defense claimed] as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

The State concedes that the failure to give the instruction was error but argues that the omission does not warrant reversal as clearly erroneous.

In several cases, our Supreme Court has held that omitting PIK Crim. 4th 51.050 is not clear error requiring reversal and remand. Our Supreme Court first considered whether it was clear error not to instruct the jury on the self-defense burden of proof in *State v. Osbey*, 238 Kan. 280, 285-86, 710 P.2d 676 (1985). The *Osbey* court held that the omission was not clearly erroneous because the trial court instructed the jury on defense of a person, reasonable doubt, the burden of proof, the definitions of the various legal terms relating to criminal intent, and the fact that the State's burden never shifted to the defendant. The *Osbey* court went further, saying that no error occurred at all because the other instructions covered and included the substance of the omitted instruction. 238 Kan. at 285-86.

But, in *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 (1991), our Supreme Court walked back the *Osbey* statement that failure to give the instruction was not error at all. Instead, the *Crabtree* court discussed the affirmative defense burden of proof instruction then, PIK Crim. 2d 52.08, as follows: "Obviously, the trial court should have given PIK Crim. 2d 52.08. PIK Crim. 2d 52.08 should be given whenever an affirmative defense is asserted in a criminal case." 248 Kan. at 40. Nevertheless, the *Crabtree* court held that the jury instruction omission was not clearly erroneous in that case because of the nature of the evidence and the nature of the affirmative defense. 248 Kan. at 41.

Then, in *State v. Sperry*, 267 Kan. 287, 294-95, 978 P.2d 933 (1999), our Supreme Court relied on *Crabtree* to find that omitting the burden of proof instruction was not clear error.

Our Supreme Court partially overruled *Osbey* in *State v. Cooperwood*, 282 Kan. 572, 147 P.3d 125 (2006). The *Cooperwood* court reaffirmed *Crabtree* and *Sperry*, holding that the trial court's failure to instruct the jury on the burden of proof for an affirmative defense was not clearly erroneous. But the *Cooperwood* court also compared the *Osbey* statement that the omission was not error with the *Crabtree* statement that "'[o]bviously, the trial court should have given PIK Crim. 2d 52.08.'" *Cooperwood*, 282 Kan. at 582. The *Cooperwood* court observed that the Notes for Use state that the burden of proof instruction "'should be given'" alongside the self-defense instruction. 282 Kan. at 582. "Accordingly, we agree that failure to do so is error." 282 Kan. at 582. Thus, the *Cooperwood* court flatly negated the idea that omitting the instruction is not error. The omission is error, but it is often a harmless one. A trial court errs by not instructing the jury on the burden of proof for affirmative defenses, but such error did not require reversal in *Osbey*, *Crabtree*, *Sperry*, or *Cooperwood*.

Trotter argues that the error warrants reversal in his case. Trotter asks us to adopt the analysis in Judge G. Gordon Atcheson's concurrence in *State v. Staten*, No. 108,305, 2015 WL 423644, at *21-26 (Kan. App. 2015) (unpublished opinion) (Atcheson, J., concurring) (*Staten I*), and Trotter quotes liberally from that concurrence. The State contends that the error is not reversible under *State v. Staten*, 304 Kan. 957, 964-67, 377 P.3d 427 (2016) (*Staten II*).

Both Trotter's and the State's arguments have flaws. Trotter's argument suffers from a mismatch because Judge Atcheson's concurrence makes a slightly different argument than Trotter's claim that the failure to give PIK Crim. 4th 51.050 was clear error. Trotter quotes well-reasoned points from Judge Atcheson's defense of the right to a

fair trial and to present an affirmative defense. But Judge Atcheson also suggested greater revisions to the jury instructions to cure "the grave problem with how the jurors were instructed—or, more accurately, not instructed—on self-defense." 2015 WL 423644, at *21 (Atcheson, J., concurring).

Judge Atcheson likened the failure to fully instruct on self-defense to a failure to instruct on an element of the crime, stating the following:

> "Although the jurors received an instruction on the test for a person's legal use of force to defend himself or herself, they were not told how to consider the evidence presented on self-defense or how the evidence would affect the State's proof of the elements of aggravated battery. The resulting void should be treated the same way as an instruction omitting an element of the charged offense, consistent with the standard recognized in *State v. Richardson*, 290 Kan. 176, 182-83, 224 P.3d 553 (2010). In this case, the omission ought to require a reversal of the conviction and a new trial for Staten. The Kansas Supreme Court has not considered the error in that light." *Staten I*, 2015 WL 423644, at *21 (Atcheson, J., concurring).

Judge Atcheson continued by proposing changes to the jury instructions as follows:

> "Considering how self-defense operates as defense rooted in justification and the statutory burden of proof for affirmative defenses, it logically should be presented to jurors in the elements instruction, assuming a defendant has crossed the slight threshold of producing evidence. In that circumstance, PIK Crim. 4th 54.310 should include an additional element phrased along these lines: 'That the defendant acted without the legal justification of self-defense, as described in Instruction No. ——,' referring to the instruction corresponding to the definition of self-defense in PIK Crim. 4th 52.200. The self-defense instruction ought to include a new second sentence stating: 'Self-defense is a legal justification in the following circumstances: [leading into the definition contained in the second paragraph of the instruction].' That approach properly places the correct burden of proof on the State and captures the interrelationship between self-defense as a

15

legal justification and the statutory elements of aggravated battery." 2015 WL 423644, at *23 (Atcheson, J., concurring).

And Judge Atcheson considered more than the question of whether omitting PIK Crim. 4th 51.050 was clearly erroneous. Instead, he set out a weakness with that instruction as follows:

> "The authors of the pattern jury instructions provide a generic instruction on the treatment of affirmative defenses. See PIK Crim. 4th 51.050. Although that instruction may be legally sufficient, it isn't as pointed as it might be in explaining how self-defense evidence should be integrated with the State's obligation to prove a defendant guilty of a crime of violence, such as aggravated battery. . . .
>
> . . . .
>
> "Because of the interwoven relationship between self-defense and what the State must prove to convict a defendant of aggravated battery, the error is a functional equivalent of the omission of an element or part of an element from the claims-to-be-proved instruction. The failure to instruct jurors on all of the elements of a charged crime creates a constitutional error. *Neder v. United States*, 527 U.S. 1, 12, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (omission of element of charge offense violates Sixth Amendment right to jury trial). . . .
>
> . . . .
>
> "Applying those legal principles, the error in the jury instructions should be declared impermissibly destructive of Staten's constitutional rights. Staten vigorously asserted a self-defense claim. So, far from being uncontested, it was the centerpiece of his defense. The failure to give any direction to the jurors on how to consider that evidence effectively relieved the State of the obligation to show beyond a reasonable doubt that Staten did not act in self-defense—an obligation legally and factually inseparable from proving the elements of aggravated battery." *Staten I*, 2015 WL 423644, at *24-25 (Atcheson, J., concurring).

Thus, Trotter's argument does not entirely align with Judge Atcheson's. Trotter makes the relatively simple claim that omitting a burden of proof instruction was clear

16

error because there is a real possibility that the jury would have reached a different verdict. But Judge Atcheson took the stronger stance that the omission should be treated the same way as an instruction omitting an element of the charged offense. In that sense, Trotter's argument is not warranted based on his liberal quotations taken from the *Staten I* concurrence.

Read as a whole, Judge Atcheson's concurrence is an eloquent defense of the rights of the accused, specifically the right to present an affirmative defense to the jury. But, to the extent that he implied that the lack of self-defense justification should be treated as an element of the charged offense, we cannot adopt the same reasoning. As Judge Atcheson pointed out, our Supreme Court had "not considered the error in that light." 2015 WL 423644, at *21 (Atcheson, J., concurring). But our Supreme Court granted review and decided *Staten II* the following year.

The *Staten II* court discussed *Osbey*, *Crabtree*, *Sperry*, and *Cooperwood*, noting that those cases were all decided when the statutes did not explicitly refer to the burden of proof when a defendant asserts an affirmative defense. But our Legislature amended the criminal code in 2010, creating K.S.A. 2011 Supp. 21-5108(c), which entitled defendants to an instruction on every affirmative defense that is supported by competent evidence.

> "This amendment codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. The amendment did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State must prove when charging a crime. . . .
>
> "The cases prior to the statutory amendment read the instructions as a whole and concluded that everything necessary for the jury to consider the burden of proof was contained within the instructions. We see no reason to change course from that line of cases. [Citations omitted.]" *Staten II*, 304 Kan. at 965-66.

17

The *Staten II* court explained that omitting the instruction on the burden of proof for self-defense is not the functional equivalent of omitting an element of the charged offense. Instead, the *Staten II* court repeated the test for clear error when a trial court omits the self-defense burden of proof instruction: Is there a real possibility that the jury would have reached a different verdict if the trial court had given the instruction? 304 Kan. at 966-67. The test remained essentially unchanged from *Crabtree*, *Sperry*, and *Cooperwood*.

Notably, the current version of PIK Crim. 4th 51.050 is more explicit about the burden of proof. In *State v. Buck-Schrag*, 312 Kan. 540, 553, 447 P.3d 1013 (2020), our Supreme Court stated the following: "Arguably, the instructions could have been clearer if they parroted the language of the statute by explicitly informing the jury that the State had to disprove the self-defense theory beyond a reasonable doubt." Shortly afterwards, the revised PIK Crim. 4th 51.050 included the sentence which is italicized here:

> "The defendant raises [describe the defense claimed] as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. *The State has the burden to disprove this defense beyond a reasonable doubt.* The State's burden of proof does not shift to the defendant." (Emphasis added.)

This change came after Trotter's trial and would not have applied to him. But the language accurately reflects the statutory treatment of affirmative defenses in criminal cases under K.S.A. 2020 Supp. 21-5108(c). The change also highlights the problem Judge Atcheson pointed out in *Staten I*, which was also present in Trotter's case. The PIK instructions, including PIK Crim. 4th 51.050, never directly or precisely told the jurors that they should acquit if the affirmative defense caused them to have a reasonable doubt as to the defendant's guilt. The current revision better instructs the jury. In any event, the test for clear error is the same for the new PIK Crim. 4th 51.050 as for the old one:

whether the jury would have reached a different verdict if the trial court had given the instruction. *Buck-Schrag*, 312 Kan. at 550.

This repeatedly stated test means that the State's argument does not work any better than Trotter's. The State pushes for an overly rigid bright-line rule that our Supreme Court has not adopted, insisting that we should follow the precedents of *Crabtree*, *Sperry*, *Cooperwood*, and *Staten II* and rule the instruction error harmless. The State's argument involves, at least implicitly if not explicitly, an assumption that the failure to instruct the jury on the self-defense burden of proof is never clear error. True, the omission was harmless error in *Crabtree*, *Sperry*, *Cooperwood*, and *Staten II*. But our Supreme Court has never stated that omitting the instruction is always harmless error. Rather, our Supreme Court applies what Judge Atcheson called "the usual standard for clearly erroneous jury instructions." *Staten I*, 2015 WL 423644, at *21 (Atcheson, J., concurring). Thus, the *Staten II* court held as follows: "In light of the generally correct nature of the instructions as a whole as well as the nature of the evidence supporting Staten's claim of self-defense, we find no basis in the instructions to reverse Staten's conviction." 304 Kan. at 967. And the *Crabtree* court determined that the instruction error was harmless because there was "a bare scintilla of evidence, if any, that would justify a self-defense instruction." 248 Kan. at 40. The State claims that failing to instruct on the self-defense burden of proof is never clear error. Nevertheless, because the nature of the evidence is a factor in the analysis, we reject the bright-line rule proposed by the State.

Trotter here presented more evidence of self-defense than the bare scintilla in *Crabtree* and the "colorable, if doubtful, claim for self-defense" in *Staten I. Staten I*, 2015 WL 423644, at *21 (Atcheson, J., concurring). The undisputed evidence is that Joe started the first fight of the evening when he attacked his brother David. Joe was also regularly armed, which is another fact not in dispute.

19

The fact that Joe regularly carried a gun is particularly relevant in light of *State v. Qualls*, 309 Kan. 553, 559-61, 439 P.3d 301 (2019). James Qualls shot and killed Joseph Beier at a bar in Topeka. The two men had been fighting. After bar patrons and employees broke up the fight, Qualls thought Beier was reaching into his pants for a gun. Qualls drew his own 9 mm pistol and killed Beier. In fact, Beier did not actually have a gun. But the *Qualls* court held that the trial court's failure to instruct on self-defense was not harmless error and remanded for a new trial. Applying *Qualls* here, we believe that Trotter should have had the full opportunity to present his self-defense claim if a reasonable person under the circumstances would have believed that a gun was soon coming into play even if Joe did not actually have a gun.

But Trotter and Klos testified that Joe did have a gun. While David testified that he did not see a gun, Trotter said that he picked up Joe's 9 mm pistol from the kitchen floor before leaving the duplex. And police found that pistol in Trotter's car. The evidence makes the failure to instruct on the self-defense burden of proof closer to clear error than in *Crabtree*, *Sperry*, *Cooperwood*, and *Staten II*.

And the trial court did instruct the jury that the State's burden never shifts to the defendant. Thus, the generally correct nature of the jury instructions as a whole is the same as in *Crabtree*, *Sperry*, *Cooperwood*, and *Staten II*. Standing alone, the failure to instruct the jury on the self-defense burden of proof is not clear error, considering our Supreme Court's precedent. Nevertheless, this lack of instruction is not Trotter's only claim of error.

*Did the State err during closing arguments?*

Trotter contends a claim of prosecutorial error based on remarks that the State made during closing argument. Trotter argues that the State misstated the law on self-

20

defense. The State contends that the prosecutor's closing remarks were not error and, alternatively, that any error was harmless.

Under *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), appellate courts use a two-step process to evaluate claims of prosecutorial error:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]"

See also *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *Sherman*, 305 Kan. at 109. Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. 305 Kan. at 114. Courts may still use prosecutorial misconduct as a descriptor for more serious occurrences. *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (finding prosecutor's conduct to amount to prosecutorial misconduct in addition to prosecutorial error).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *Butler*, 307 Kan. at 864; see also *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by defense counsel.'" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct); see *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015) (stating the "'open-the-door rule does not insulate a prosecutor from a finding of misconduct'" when responding to defense arguments).

A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see also *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015) (prosecutor's statement that, in effect, asserted the defendant could not rely on inconsistent defenses was a misstatement of the law and impermissible); *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010) (misrepresentation of burden of proof in closing argument).

22

Trotter complains of several erroneous statements made during the State's closing arguments. His complaints relate to his self-defense claim, witness credibility, the elements of aggravated battery, and the elements of criminal discharge of a firearm.

Turning to Trotter's claim that the prosecutor made erroneous statements about self-defense, he points to these portions of the prosecutor's rebuttal closing statement as misstating the test for self-defense:

> "[Defense counsel] talks loudly, but he doesn't say very much, not particularly when it comes to the law. I've got about 15 minutes to give you the information about the law that applies to this case before you go in and you start your deliberations.
> "There are no heroes in this case. This was an unnecessary death. Joseph died unnecessarily. Self-defense is when someone can stand up and righteously and legally say that it was necessary to take another person's life, that it was necessary to be the one who decides who lives and dies. There is no way Manuel Trotter can say that in this situation.
> ". . . Self-defense is what we call an affirmative defense, meaning Manuel Trotter has to agree and consent and understand that each of those elements have been met by the State before he can raise an affirmative defense saying I did the crime, but I am entitled to do that crime. That's what self-defense is.
> "So that is what he had put forth, ladies and gentlemen. He's saying he was entitled, justified, he is blessed, according to Mr. Trotter, that he is blessed by the laws of the State of Kansas and he is allowed, authorized and in fact, society demands that he take Joseph Seabolt's life. No reasonable person can say that."

Trotter argues that the prosecutor's comments during closing argument added components to self-defense which are not required by law. Trotter contends that he did not have to be a "hero" or act "righteously." He also maintains that the law on self-defense does not require that he is "blessed" as "the one who decides who lives and dies" and that "society demands" that he take Joe's life. The State argues that the prosecutor did not state that Trotter had to be a hero to prevail on a self-defense claim. And the State

23

argues that the other complained-of terms, such as "righteously," were the prosecutor summarizing self-defense in everyday language.

Defense counsel objected to the prosecutor's rebuttal argument, stating, "Judge, I'm going to object. This is beyond the law as the Court is going to instruct, [the prosecutor is] giving them different law she wants them to consider." The trial court judge overruled the objection after telling the jury, "If there is anything that is said by the attorney that differs from the law that I've instructed you or the facts as you find them, they're to be disregarded." At the end of closing, the prosecutor ended with the following: "Ladies and gentlemen, there is no reason for Mr. Seabolt to have died. There is no self-defense, there is no hero and Manuel Trotter certainly isn't the hero of his own story here." As Trotter correctly points out, the prosecutor made those comments during rebuttal, knowing that Trotter had made his closing argument and would have no further opportunity to respond. Because the prosecutor made the preceding comments during rebuttal, the timing of the prosecutor's inappropriate comments magnified its prejudicial effect. See *Zapata v. Vasquez*, 788 F.3d 1106, 1122 (9th Cir. 2015) (holding that "[t]he presentation of improper material at the end of trial 'magnifie[s]' its prejudicial effect because it is 'freshest in the mind of the jury when [it] retire[s] to deliberate'").

The prosecutor here erred in making an ad hominem personal attack against Trotter's character in its closing rebuttal argument. The prosecutor vividly compared Trotter's unheroic and unblessed killing of Joseph Seabolt to individuals who are heroic and righteous when they are forced to kill another human being in self-defense. A prosecutor may not misstate the governing law to the State's advantage in arguing the case for a guilty verdict to the jurors. *Tahah*, 302 Kan. at 791. The prosecutor went beyond simply summarizing the law in everyday terms. The prosecutor erred by adding moral components which are not part of the statutory scheme allowing Kansans to act in self-defense. The prosecutor told the jury what attributes an individual who is claiming self-defense should possess, clothing such an individual with superior moral

characteristics than what the law requires. K.S.A. 2016 Supp. 21-5222 does not require an act of self-defense to be heroic and righteous any more than it requires a craven act of self-preservation. All such moral judgments are left out of the statute.

Yet, the prosecutor here stressed that Trotter possessed none of the higher moral attributes that the prosecutor felt were part of defending oneself or others. By adding those components during closing argument, the prosecutor shifted the burden from the State to Trotter. Indeed, the prosecutor raised the bar with these moral subjective characteristics for a valid self-defense claim and lowered the State's own bar for disproving the self-defense claim. Arguments of this type are very dangerous because moral guilt and subjective personal judgmental beliefs deflect the jury's attention from determining Trotter's legal guilt based on the statutory law and the jury instructions given it by the trial court.

With this kind of rebuttal argument, the prosecutor was tapping into the individual conscience of the jurors. Thus, the prosecutor's argument would be a snare to the moral sentiments of the jurors and to what they believed was just, right, or acceptable in society. *State v. Brown*, 59 Kan. App. 2d 418, 445, 486 P.3d 624 (2021) ("This kind of argument would be a snare to the moral sentiments of the jurors and to what they believed is just, right, or acceptable in society."). For instance, the prosecutor's argument can be reconstructed into this categorical syllogism:

Major premise: Individuals who kill someone and claim self-defense must possess attributes of the following: be heroic, be righteous and legally required "to take another person's life," "be the one who decides who lives and dies," be "blessed by the laws of the State of Kansas," and be required by "society" to "take" someone's "life."

Minor premise: When Trotter took "Joseph Seabolt's life," he possessed the following attributes: he was unheroic, he was unrighteous and not "legally" required "to

25

take another person's life," he was ineligible "to be the one who decides who lives and dies," he was unblessed "by the laws of the State of Kansas," and he was not demanded by "society" to "take Joseph Seabolt's life."

Conclusion: Therefore, Trotter's killing of Joseph Seabolt was not in self-defense.

Plainly, there is no purpose or support for the prosecutor's syllogistic argument except to inflame the passions and prejudices of the jurors.

The prosecutor here explicitly invited the jurors to protect society against such killers like Trotter. Indeed, the prosecutor's argument evoked the unfairness which would result if the jury were to find Trotter not guilty for killing Joseph Seabolt based on his claim of self-defense.

Because this error combines with the trial court's instructional error on self-defense, we defer our discussion of prejudice to the analysis of Trotter's claim of cumulative error. See *State v. Conaway*, No. 121,848, 2021 WL 4704029, at *5 (Kan. App. 2021) (unpublished opinion) ("We defer our discussion of prejudice to our analysis of . . . cumulative error."), *rev. denied* 314 Kan. 856 (2022).

But Trotter's other claims of prosecutorial error are unpersuasive. He argues that the prosecutor erred in closing when it told the jury the following:

> "While Mr. Trotter enjoys the presumption of innocence during the presentation of evidence, he does not enjoy the right to be presumed credible. You must judge his statements, judge his words as harshly as you judge anyone else who testified. You must determine the weight and the credit you give his words, the same as you do for everyone else."

26

The prosecutor's admonition was not error. Prosecutors are not permitted to offer personal opinions about the credibility of a witness, including the defendant, because such comments are "'unsworn, unchecked testimony, not commentary on the evidence of the case.' [Citations omitted.]" *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016). But the prosecutor here did not offer a personal opinion and only reminded the jury of its duty to judge witness credibility. Trotter may have wished for the prosecutor to phrase it positively rather than negatively—that the jury credit his testimony as much as other witnesses, instead of judging his testimony as harshly. But the prosecutor did not err in its choice of phrasing.

Trotter also complains of the prosecutor's comments on aggravated battery. He claims that the prosecutor misstated the evidence with the following: "Use your common sense, . . . what does it do to the brain for somebody to be rendered unconscious with a blunt force object? If that isn't a serious injury, contemplated by the use of a deadly weapon, then what is?" But prosecutors are allowed to argue reasonable inferences drawn from the admitted evidence. *Pribble*, 304 Kan. at 832. Trotter testified that he hit Joe to try to knock him unconscious. The prosecutor did not argue facts not in evidence but stayed within the confines of admitted evidence and reasonable inferences. The State did not err.

Finally, Trotter argues that the prosecutor misstated his own testimony when discussing criminal discharge of a firearm. The prosecutor's comment was the following: "There's the first evidence at the scene, there's the bullet wound—or the gunshot hole, the defect in the door and in the wall. Ladies and gentlemen, no one has contested that that actually happened, everyone agrees, the defendant himself agrees count three happened." Trotter argues that this is a misstatement because he testified that he shot at the door lock but did not admit or agree to the elements of criminal discharge of a firearm. The prosecutor's closing argument fairly argued that Trotter's testimony supported the elements of the offense, and any semantic difference was negligible. There is no

reasonable possibility that this error, if any, affected the verdict. See *Pribble*, 304 Kan. at 834.

*Did cumulative trial errors deny Trotter a fair trial?*

Trotter argues that the accumulated effect of multiple trial errors denied him a fair trial. The State argues that the trial contained no errors. Because the prosecutor's ad hominem closing argument intended to inflame the jury to convict Trotter of involuntary manslaughter, misstated the law on self-defense, and the trial court failed to remedy the errors with an appropriate jury instruction, we hold that these trial errors deprived Trotter of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46.

If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020) (citing *Chapman*, 386 U.S. 18).

Here, the prosecutor specifically told the jurors that Trotter was unheroic, he was unrighteous and not "legally" required "to take another person's life," he was ineligible "to be the one who decides who lives and dies," he was unblessed "by the laws of the State of Kansas," and he was not demanded by "society" to "take Joseph Seabolt's life."

This argument, however, mischaracterizes the law. Also, these comments are in violation of the following jury instruction:  Again, Instruction No. 5, based on PIK Crim. 4th 52.200, explained the theory of self-defense as follows:

> "Mr. Trotter claims his use of force was permitted as self-defense and/or defense of another as to count 1 involuntary manslaughter. Mr. Trotter is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself and/or someone else from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief.
> "When use of force is permitted as self-defense or defense of someone else, there is no requirement to retreat."

Instruction No. 5, however, does not say an act of self-defense must be heroic, be righteous, be "legally" required "to take another person's life," be eligible "to be the one who decides who lives and dies," be blessed "by the laws of the State of Kansas," and be demanded by "society" to "take Joseph Seabolt's life."

Thus, the prosecutor argued a question of law with a view of contradicting a jury instruction. Indeed, the prosecutor's rebuttal argument concerning the jury instructions should have been confined by the jury instructions given by the court, and any discussion or interpretation of the jury instructions tending to question or contradict the correctness of law laid down by the court should not have been tolerated.

In short, the prosecutor's statements raised the self-defense standard. K.S.A. 2016 Supp. 21-5222(b) requires a reasonable belief that the use of deadly force is necessary to prevent imminent death or great bodily harm. But the prosecutor's rebuttal argument told the jury that Trotter's act of self-defense needed to be heroic, righteous, and blessed by

29

the laws of the State of Kansas. Thus, the prosecutor misrepresented the affirmative defense of self-defense. Also, after Trotter's objection, the trial court did little to correct the prosecutor's misstatement of law. In fact, the trial court's failure to follow the PIK Notes on Use also adversely affected Trotter's ability to present his self-defense claim.

In this sense, Trotter's case is analogous to *Thomas*. *Thomas* involved a jury instruction error which allowed the jury to find guilt for aggravated battery on a less culpable intent than required by the statute. The prosecutor's trial comments compounded the error by urging the jury to convict based on emotional considerations, rather than a reasoned and deliberate consideration of the facts and the law. 311 Kan. at 915. Here, the prosecutor's use of terms like "blessed" and "righteously" added emotional, even religious, overtones which are not considerations for the affirmative defense of self-defense. Then, the trial court failed to specify to the jury that the State must disprove Trotter's self-defense claim, further eroding Trotter's right to present a defense in a fair trial.

Thus, the prosecutor's ad hominem comments, misstatement of law to the jury, and the trial court's failure to instruct the jury that the State must disprove Trotter's self-defense claim were not harmless beyond a reasonable doubt. As a result, the State has not met its burden to show beyond a reasonable doubt that there is no reasonable possibility that the errors affected the verdict.

For these reasons, we reverse Trotter's conviction for involuntary manslaughter, vacate his sentence for involuntary manslaughter, and remand for a new trial.

*Is criminal restitution unconstitutional?*

Trotter argues that Kansas' restitution scheme violates his right to a civil jury trial under section 5 of the Kansas Constitution Bill of Rights or his right to a criminal jury

30

trial under section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution. He did not raise these issues before the trial court. Generally, Kansas appellate courts will not decide issues raised for the first time on appeal. See *State v. Robison*, 314 Kan. 245, 247, 496 P.3d 892 (2021), *petition for cert. filed* February 11, 2022. Nevertheless, Trotter claims that two exceptions allow him to raise the issue:  (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case and (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See 314 Kan. at 247-48. An appellate court's decision to review an unpreserved claim under either of these exceptions is a prudential decision, and even when an exception is satisfied, appellate courts need not review the newly asserted claim. See 314 Kan. at 248.

We decline to exercise our discretion to address Trotter's restitution claims because we have remanded his case for a new trial on involuntary manslaughter. Our Supreme Court recently addressed each of the arguments Trotter presents in *Robison* and *State v. Arnett*, 314 Kan. 183, 496 P.3d 928 (2021), *petition for cert. filed* February 11, 2022. Our Supreme Court partially agreed with Trotter, finding that certain portions of the criminal restitution statutes did violate section 5 of the Kansas Constitution Bill of Rights because they gave restitution orders the effect of a civil judgment without giving the defendant the right to a civil trial. Our Supreme Court, however, severed those portions of the restitution statutes. *Robison*, 314 Kan. at 255-57; *Arnett*, 314 Kan. at 194-95. On remand, the trial court should review the issue of restitution and, if necessary, create a new restitution order in keeping with the *Robison* and *Arnett* decisions.

*Did the State prove the elements of criminal discharge of a weapon?*

Trotter argues the State failed to present sufficient evidence at trial to prove he criminally discharged a firearm in violation of K.S.A. 2016 Supp. 21-6308 when he shot

the lock on the door to the duplex unit he rented. During the partying, Trotter apparently locked himself out and fired his handgun at the lock at least once.

As defined in K.S.A. 2016 Supp. 21-6308(a)(1)(A), criminal discharge of a firearm requires the "[r]eckless and unauthorized discharge of any firearm:  [a]t a dwelling, building or structure in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present."

We ordered the parties to provide supplemental briefing on Trotter's jury conviction for unlawful discharge of a firearm under K.S.A. 2020 Supp. 21-6308(a)(1)(A). We specifically asked the parties to address what does the term "unauthorized" mean or require as an element of the crime under K.S.A. 2020 Supp. 21-6308(a)(1)(A).

In response to our order, Trotter continues to maintain that the State has failed to prove beyond a reasonable doubt that he was "unauthorized" to shoot out the lock of the door to his duplex. The State, however, argues that because Trotter discharged a firearm at an occupied dwelling when he was unauthorized to do so, his sufficiency of evidence challenge should fail. The State also argues that because Trotter "failed to make any argument regarding the broader definition of 'unauthorized' as used" under K.S.A. 2020 Supp. 21-6308(a)(1)(A), we should rule that he has abandoned any argument about the definition of unauthorized under K.S.A. 2020 Supp. 21-6308(a)(1)(A). And we should not address any arguments not raised by him.

In addition to K.S.A. 2020 Supp. 21-6308(a)(1)(A), we note another statute that similarly relates to the criminal discharge of a firearm. It is K.S.A. 2020 Supp. 21-6308a. As Trotter points out in his supplemental brief, K.S.A. 2020 Supp. 21-6308a was enacted as part of 2013 Senate Substitute for House Bill 2052. L. 2013, ch. 105, § 1. Trotter

32

further notes in his brief that some supporters of HB 2052 wanted to insure "that city ordinances covering discharge of a firearm do not include people defending themselves." Trotter also recognizes that other supporters of HB 2052, like the Kansas Association of Chiefs of Police and the Kansas Peace Officers Association, emphasized that cities are never the appropriate place for discharging a firearm.

Again, K.S.A. 2020 Supp. 21-6308a(a) prohibits the "reckless discharge of a firearm within or into the corporate limits of any city." Unlike K.S.A. 2020 Supp. 21-6308(a)(1)(A), there is no lack of authority requirement under K.S.A. 2020 Supp. 21-6308a(a). We also note that K.S.A. 2020 Supp. 21-6308a(b) exempts seven kinds of discharges of a firearm from the prohibitions under K.S.A. 2020 Supp. 21-6308a(a). Subsection (b) of K.S.A. 2020 Supp. 21-6308a states that this statute "shall not apply to the discharge of any firearm within or into the corporate limits of any city if:

"(1) The firearm is discharged in the lawful defense of one's person, another person or one's property;

"(2) the firearm is discharged at a private or public shooting range;

"(3) the firearm is discharged to lawfully take wildlife unless prohibited by the department of wildlife, parks and tourism or the governing body of the city;

"(4) the firearm is discharged by authorized law enforcement officers, animal control officers or a person who has a wildlife control permit issued by the Kansas department of wildlife, parks and tourism;

"(5) the firearm is discharged by special permit of the chief of police or by the sheriff when the city has no police department;

"(6) the firearm is discharged using blanks; or

"(7) the firearm is discharged in lawful self-defense or defense of another person against an animal attack."

We note that Trotter's discharges of a firearm occurred within the corporate limits of the city of Wichita, Kansas. Indeed, in the State's supplemental brief, it specifically stated that "there was express testimony that the [shooting] incident occurred in Wichita."

33

And we further note that Trotter's discharges of a firearm into the door of his duplex unit do not fit under any of the previously mentioned seven exceptions of K.S.A. 2020 Supp. 21-6308a(b).

K.S.A. 2016 Supp. 21-6308(a)(1)(A) prohibits the criminal discharge of a firearm that is reckless and unauthorized "[a]t a dwelling, building or structure in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present." Based on Trotter's interpretation of K.S.A. 2016 Supp. 21-6308(a)(1)(A), Trotter could not be found guilty under that statute because the State failed to prove that he lacked authority to shoot holes through the door of his duplex, even though he committed these acts within the corporate limits of the city of Wichita, Kansas. We believe, however, Trotter would acknowledge that if the State had charged him with violating K.S.A. 2016 Supp. 21-6308a by shooting holes into the door of his rental duplex, his trial testimony alone—that he had shot through the door of his duplex unit within the corporate limits of the city of Wichita, Kansas—would have been a sufficient basis for a reasonable jury to have found him guilty of that charge. This points to a conflict between K.S.A. 2016 Supp. 21-6308(a)(1)(A) and K.S.A. 2016 Supp. 21-6308a.

Turning our attention to the issue of statutory construction, we note that one of the most fundamental rules in statutory interpretation is that statutes *in pari materia* (relating to the same subject matter) are to be compared with each other and construed together. Thus, when construing statutes to determine legislative intent, the court must consider various provisions of an act *in pari materia* with a view of reconciling and bringing the provisions into a workable harmony if possible. *State v. Keel*, 302 Kan. 560, 573-74, 357 P.3d 251 (2015); see also *Miller v. Board of Wabaunsee County Comm'rs*, 305 Kan. 1056, 1066, 390 P.3d 504 (2017) (While explaining when interpreting a statute, the court pointed out that a court is required to construe a statute in a manner that is consistent with the entire provisions of an act.).

To reconcile and bring the provisions of K.S.A. 2016 Supp. 21-6308a and K.S.A. 2016 Supp. 21-6308(a)(1)(A) into a workable harmony one must consider the intent of the Legislature. When you consider the Legislature's intent under K.S.A. 2016 Supp. 21-6308a, the plain language of that statute is aimed at preventing the indiscriminate discharge of firearms within or into the corporate limits of any city. Thus, the Legislature's intent in enacting K.S.A. 2016 Supp. 21-6308a was to protect residents of cities against the reckless firing of firearms within or into the corporate limits of any city. K.S.A. 2016 Supp. 21-6308a harkens back to the 1880s when towns like Tombstone, Arizona, displayed signs stating the following: WELCOME TO TOMBSTONE—No Carrying of Firearms Within City Limits. This was done to protect the occupants of Tombstone against the indiscriminate firing of firearms in the city limits. The Legislature here clearly enacted K.S.A. 2016 Supp. 21-6308a to protect residents of cities against the reckless discharge of firearms within or into the corporate limits of any city.

Because there is a conflict between K.S.A. 2016 Supp. 21-6308(a)(1)(A) and K.S.A. 2016 Supp. 21-6308a, we look to which statute was enacted later. Our Supreme Court has declared the following: "It is a settled rule of statutory construction that where an irreconcilable conflict exists between statutes, the latest enactment will be held to supersede, repeal or supplant the earlier by implication; the later enactment must prevail." *Richards v. Etzen*, 231 Kan. 704, Syl. ¶ 1, 647 P.2d 1331 (1982); see *State v. Ricks*, 173 Kan. 660, 662, 250 P.2d 773 (1952). Thus, when an irreconcilable conflict exists between two statutes, the last enactment of the two statutes is used to shine a light on the way the two statutes should be harmonized.

As previously noted, K.S.A. 2016 Supp. 21-6308a was enacted as part of 2013 Senate Substitute for House Bill 2052. L. 2013, ch. 105, § 1. On the other hand, K.S.A. 2016 Supp. 21-6308(a)(1)(A) was enacted as part of 1992 House Bill 2709. L. 1992, ch. 21, § 1. Thus, K.S.A. 2016 Supp. 21-6308a was the last enactment and must prevail

35

by implication, since it is presumed that the Legislature did not intend to leave contradictory acts on the books.

Thus, when defendants violate K.S.A. 2016 Supp. 21-6308(a)(1)(A) by firing a firearm within or into the corporate limits of any city, they do so without authority unless they fit within one of the seven exceptions under K.S.A. 2016 Supp. 21-6308a(b). Because Trotter's acts of shooting through the door of his duplex do not fit within any of these exceptions under K.S.A. 2016 Supp. 21-6308a(b), his discharge of a firearm into the door of his duplex within the corporate limits of the city of Wichita, Kansas, was done without authority under K.S.A. 2016 Supp. 21-6308(a)(1)(A). As a result, we affirm his criminal discharge of a firearm conviction.

*Did the State prove the elements of aggravated battery?*

Trotter argues that the State failed to prove one of the elements of aggravated battery. He asserts that the State did not show that Trotter used a "deadly weapon" when he struck Joe. The State responds that the jury had sufficient evidence to conclude that Trotter beat Joe with a deadly weapon when he struck him in the face several times with the barrel of a rifle. Because the evidence supports the jury's determination that the barrel of the rifle was a deadly weapon, we affirm Trotter's conviction.

The State needed to prove that Trotter knowingly caused bodily harm to Joe with a deadly weapon. See K.S.A. 2016 Supp. 21-5413(b)(1)(B). The trial court instructed the jury that a deadly weapon is the following:  "[A]n instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury." Trotter claims that the State failed to show that the rifle barrel was a deadly weapon.

Trotter argues that the definition of a deadly weapon allows for three constructions:  (1) Trotter calculated to kill or seriously injure Joe by hitting him with the

36

rifle; (2) the rifle is calculated to kill or seriously injure as a hitting instrument; or (3) Trotter's use of the rifle was likely to kill or seriously injure Joe. But then Trotter acknowledges that caselaw focuses on the manner of use, not the desire of the user or the intent of the object. See *State v. Ultreras*, 296 Kan. 828, 854, 295 P.3d 1020 (2013). Thus, Trotter's first argument fails because the question for the jury was not whether Trotter calculated to kill or seriously injure Joe when hitting him with the rifle barrel. Similarly, Trotter presents a flawed argument when he contends that the State needed to produce expert evidence that the rifle's designers calculated it to kill or seriously injure when used as a hitting instrument. In deciding whether the rifle was a deadly weapon, the jury needed to determine whether Trotter used the rifle in a manner likely to inflict great bodily injury, disfigurement, or death. 296 Kan. at 854; see *State v. Murdock*, 286 Kan. 661, 669-70, 187 P.3d 1267 (2008) (circumstantial evidence can be sufficient to support a conviction).

"Whether or not a gun used as a club is a deadly weapon for aggravated battery purposes is a jury question." *State v. Colbert*, 244 Kan. 422, 427, 769 P.2d 1168 (1989). Michael Colbert robbed a 7-Eleven store with a defective and empty .38 caliber gun. He hit the store clerks with the pistol. Our Supreme Court held that the jury must determine whether the particular use in the case was sufficient to make the gun a deadly weapon. "For instance, lightly pressing the barrel of a gun into the victim's back to make the victim move or do an act could hardly be considered use of a deadly weapon for aggravated battery purposes." 244 Kan. at 427. Factors guiding the jury's determination include the size of the weapon, the amount of force used, and the portion of the body contacting the gun. 244 Kan. at 426-27.

Here, Joe's face and head contacted the gun's barrel. David testified, and Trotter admitted, that Trotter hit Joe in the head with the rifle multiple times while Joe was lying on the ground. After the beating, Joe had bruising and lacerations on his face, neck, and ear. After Joe's death, the autopsy showed bleeding into his scalp. The jury had sufficient

evidence to conclude that the rifle barrel used to hit Joe qualified as a deadly weapon. We affirm Trotter's conviction for aggravated battery.

*Did the trial court err by providing the jury with a verdict form that put guilty before not guilty?*

Trotter argues that the trial court violated his presumption of innocence by placing the "guilty" option above the "not guilty" option on the verdict forms. Because Trotter's challenge asks whether the verdict forms were legally appropriate, we exercise unlimited review. *State v. Fraire*, 312 Kan. 786, 795-96, 481 P.3d 129 (2021).

Trotter acknowledges that the verdict forms conform to the applicable PIK instructions. He also acknowledges that our Supreme Court has found that placing "guilty" first does not violate the presumption of innocence. See *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004); *State v. Wesson*, 247 Kan. 639, 652, 802 P.2d 574 (1990). Trotter argues that *Wesson* and *Wilkerson* were wrongly decided.

We are duty-bound to follow our Supreme Court's precedent absent some indication that our Supreme Court is departing from its previous position. *State v. Vrabel*, 301 Kan. 797, 809-10, 347 P.3d 201 (2015). Rather than hint at a departure, our Supreme Court explicitly stuck to its previous position in *Fraire*. The *Fraire* court found no reason to believe that the order in which the verdict form presents the options has any bearing on the verdict. "Realistically, jurors are probably not closely examining the verdict form before they begin their deliberations, and it is unrealistic to suggest they change their collective conclusion when the foreperson starts to fill out the form." 312 Kan. at 796. The verdict form used in Trotter's jury trial presents no error of law. As a result, we affirm.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.